**ECO MANUFACTURING LLC, Plaintiff,**

v.

**HONEYWELL INTERNATIONAL, INC., Defendant.**

**No. 1:03–cv–0170–DFH.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 20, 2003.

Lisa M. Barr, Alexandra N. DeNeve, Sofia Foltushansky, Paul R. Garcia, John T. Hickey, Jr, Kirkland & Ellis, Chicago, IL, Lee B. McTurnan, Gregory A. Neibarger, McTurnan & Turner, Indianapolis, IN, for Defendant.

Michael D. Beck, David M. Lockman, Paul J. Maginot, Harold C. Moore, Maginot Moore & Bowman, Indianapolis, IN, Plaintiff.

## ENTRY ON DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

### I. *Introduction*

Defendant Honeywell International, Inc. has moved for a preliminary injunction barring plaintiff Eco Manufacturing LLC from manufacturing and selling a round thermostat. Honeywell contends that Eco's round thermostat violates Honeywell's trademark rights. The court heard evidence and argument on May 19 through 21, 2003, and now states its findings of fact and conclusions of law pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure. All findings of fact and conclusions of law are based on the limited record established in the preliminary injunction proceeding and are subject to reconsideration on a more complete record.

Honeywell seeks to protect its product configuration—the round shape of a thermostat—as a trademark. Trademarks can include "any word, name, symbol, or device, or any combination thereof." 15 U.S.C. § 1127. The protection of trademark law can reach "trade dress" and product configurations that serve to identify the source of a product. *E.g., Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (decorations and other features to evoke Mexican theme of restaurant could

be protected as trade dress). The Supreme Court has cautioned, however, against "misuse or overextension of trade dress," noting that "product design almost invariably serves purposes other than source identification." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001), quoting *Wal–Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 213, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (also stating that "almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing").

Honeywell's motion requires the court to address the trademark doctrine of functionality and the relationship between trademark law and patent law. Trademark law protects for an unlimited time a company's non-functional trademarks designating the source of a product. Patent law gives an inventor exclusive use for a limited time of novel, useful, and non-obvious inventions. After the patent expires, though, the American public has a right to practice the invention. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 2048, 156 L.Ed.2d 18 (2003), citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 230, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 121–22, 59 S.Ct. 109, 83 L.Ed. 73 (1938).

Especially in product configuration cases, the doctrine of "functionality" plays a critical role in maintaining the boundary between these two fields of law. The boundary is important because it should prevent a business from first obtaining legitimate but temporary patent protection for a useful invention, and then obtaining a trademark on the configuration to extend its rights improperly so as to obtain exclu-sive and perpetual rights to a useful product design. See *TrafFix Devices*, 532 U.S. at 29, 121 S.Ct. 1255; *Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273 (Fed.Cir.2002) (affirming rejection of trademark application based on functionality doctrine), quoting *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); see also *Dastar Corp.*, 539 U.S. at ——, 123 S.Ct. at 2048–50 (holding that trademark law could not be used to trump copyright law to give perpetual protection to use of materials in public domain, and explaining decision in terms of the "bargain" that both copyright and patent holders make with the public to allow public use after exclusive rights expire).

As explained below, the court denies Honeywell's motion for a preliminary injunction because Honeywell is unlikely to succeed on the merits of its claims. The court bases its decision primarily upon the reasoning and holding in *TrafFix Devices*, which taught that a utility patent is "strong evidence that the features therein claimed are functional," and therefore cannot be protected by a trademark. 532 U.S. at 29, 121 S.Ct. 1255. Honeywell's round thermostat configuration was the subject of a utility patent that was issued in 1946 and expired in 1963.

*TrafFix Devices* left open a narrow exception to allow for the possibility that trademark law could protect "arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims." *Id.* at 34, 121 S.Ct. 1255. That exception does not apply here. The record here shows that Honeywell obtained its expired utility patent by persuading the Patent Office that the circular, convex shape of its thermostat was indeed novel and useful when the patent was issued in 1946. The record as a whole further shows that giving Honeywell exclusive

rights to the circular, convex shape puts Honeywell's competitors at "a significant, non-reputation-related disadvantage." See *id.* at 33, 121 S.Ct. 1255.

When Honeywell's utility patent expired, the public received the benefit of the patent bargain—the right to practice the claimed invention, "including the right to make it in precisely the shape it carried when patented." *Dastar Corp.*, 539 U.S. at ——, 123 S.Ct. at 2048, quoting *Sears, Roebuck*, 376 U.S. at 230, 84 S.Ct. 784. Thus, the public has the right to use the circular, convex shape of the Honeywell thermostat. Plaintiff Eco is entitled to do so, using its own trademark and without suggesting that its product is made by or associated with Honeywell. Eco's evidence shows that the circular, convex shape is functional and that the Trademark Trial and Appeal Board ("TTAB") erred in 1988 when it issued Honeywell a registered trademark on that shape. The TTAB made its decision in an *ex parte* proceeding with an incomplete record, and it applied a standard of functionality that was much more favorable to Honeywell than the correct legal standard later adopted by the Supreme Court in *TrafFix Devices.*

## II.  *The Parties and Their Products*

Defendant Honeywell is the largest seller of thermostats in the United States. In the 1940s, when the company was known as the Minneapolis–Honeywell Regulator Company, Honeywell engineers invented a new design for an electro-mechanical thermostat. The design has a circular base with a round, convex cover and a round dial in the center of the cover. Over the past 50 years, Honeywell has sold more than 85 million round thermostats. Honeywell estimates that it has spent about $70 million over the years to advertise and promote "The Round," the current version of which is known in the industry as the T87 model. For at least the past 15 years, Honeywell has been the only company selling round thermostats in the United States. As discussed in more detail below, the evidence shows that Honeywell's round design is widely recognized in the industry. Many HVAC (heating, ventilation and air-conditioning) contractors and others in the industry even say that, in this business, "round means Honeywell."

Plaintiff Eco Manufacturing LLC is a new company that is developing a new thermostat. Eco intends to sell thermostats that do not use mercury to determine room temperature. Eco has developed a design for a thermostat that looks similar to the round thermostats manufactured and sold by defendant Honeywell, Inc. The Eco design is circular when viewed from head-on. In profile, however, it is not perfectly round, as Honeywell's design is, but it has a conical shape that appears similar to Honeywell's design. Eco plans to market the new product as "Eco Stat."

Eco introduced its planned product to the industry at a trade show in January 2003. After Honeywell learned of Eco's plan, it threatened to sue Eco for trademark infringement and related wrongs. Eco then filed this action for a declaratory judgment stating that its product would not infringe any of Honeywell's trademarks. Honeywell responded with a motion for preliminary injunction to block Eco from selling its new round thermostats. The parties conducted expedited discovery and then presented evidence.

In its motion for preliminary injunction, Honeywell claims that Eco's product will infringe Honeywell's registered U.S. Trademark 1,622,108 (here, "the '108 trademark"), which has become "incontestable." See 15 U.S.C. § 1114(1)(a). Honeywell also claims that Eco's product will infringe its registered trademark No. 1,439,016 for the words "The Round," as well as its common law trademark rights

under 15 U.S.C. § 1125(a)(1)(A) and its rights under the Anti–Dilution Act, 15 U.S.C. § 1125(c).

### III. *Legal Protection of Honeywell's Round Design*

Because the critical issue here is functionality, based on the guidance in *TrafFix Devices* about the role of utility patents, the court must review in detail the history of Honeywell's intellectual property protection for its round thermostat design. That history begins with a utility patent, followed by a design patent, and finally the '108 registered trademark issued after protracted proceedings before the Patent and Trademark Office ("PTO").

### A. *The Utility Patent*

*TrafFix Devices* shows that a utility patent's claims, specifications, and prosecution history can all provide highly relevant evidence in determining the functionality of a product configuration or feature for which trademark protection is claimed. See 532 U.S. at 31–32, 34, 121 S.Ct. 1255.

The story here begins with the 1946 issuance of U.S. Patent No. 2,394,920 ("the '920 patent"), which expired 17 years later in 1963. The inventor on the '920 patent was Carl G. Kronmiller, who worked for Honeywell and assigned his invention to it. Claim 23 of the '920 patent is the key claim here:

> 23. A unitary air condition responsive device comprising, in combination, a round base, air condition responsive means mounted upon said base, control means actuated by said air condition responsive means, a circular convex shaped cover for enclosing said responsive means having its center substantially coinciding with the center of said

base, the cover comprising a stationary portion and a rotatable portion having a circular periphery, the axis of rotation of said rotatable portion coinciding with the center of said cover as a whole, means for mounting said cover on said base, and means actuated by said rotatable cover portion for adjusting the value of the condition at which said air condition responsive means actuates said control means.

Eco Mot. Summ. J., Ex. K at 1–2.[1] After penetrating the "patent-ese," it is clear that Claim 23 protected the shape of the round thermostat. Apart from matters of shape, Claim 23 required the combination of "air condition responsive means" (*i.e.*, a thermometer) with "control means actuated by said air condition responsive means" (*i.e.*, a switch to turn on or off a furnace and/or air-conditioner activated by the thermometer), and a means for adjusting the temperature that activates the switch. These three elements of the claim will be present in essentially any thermostat. The file history of the '920 patent shows also that these three elements were not new.

Honeywell secured Claim 23 of the '920 patent by convincing the Patent Office that the shape elements of the claim were useful, novel, and not obvious from the prior art. Those elements include the round base, the "circular convex shaped cover" for enclosing the responsive means "having its center substantially coinciding with the center of said base," with the "cover comprising a stationary portion and a rotatable portion coinciding with the center of said cover as a whole," and with the "rotatable cover portion" being the mechanism for setting the desired temperature. *Id.*

---

1. The prosecution history documents filed with Eco's brief in support of its pending motion for summary judgment are all contained in Exhibit 601 from the hearing on Honeywell's motion for preliminary injunction. Citations to the summary judgment exhibits are more specific and easier to use.

As part of the prosecution of the '920 patent, Honeywell had drafted proposed Claims 9 and 12, which were the predecessors of what ultimately became Claim 23 in the '920 patent. Proposed Claim 9 read:

In a temperature responsive device, a round base, a thermostat on said base, control means actuated by said thermostat, a circular convexed [sic] shaped cover for enclosing said thermostat and control means, said cover being spaced apart from said base so as to provide an opening surrounding the thermostat for the circulation of air to the thermostat.

Eco Mot. Summ. J., Ex. E. Proposed Claim 12 read:

A unitary air condition responsive device comprising, in combination, a base, air condition responsive means mounted upon said base, control means actuated by said air condition responsive means, a circular convexed shaped cover for enclosing said air condition responsive means and said control means, means for mounting said cover on said base in spaced relation to said base whereby there is provided an opening surrounding said air condition responsive means for circulation of air to said air condition responsive means, an annular adjustment means rotatably mounted substantially concentric with the apex of said convexed shaped cover, and said annular adjustment means manually adjustable for the control of the condition value at which said air condition responsive means may actuate said control means.

*Id.*

The examiner disallowed proposed Claim 12, along with Claims 9, 10, 11, and 13, as unpatentable over Newman, U.S. Patent No. 2,225,080. The examiner wrote: "The cover 11 in Newman is held to be the patentable equivalent of applicant's cover." Eco Mot. Summ. J., Ex. F. The Newman reference described a thermostat with rotatable disc for adjusting the temperature and an overall cover with a rectangular shape with slightly rounded corners. See Ex. 651 (U.S. Patent No. 2,225,080).

In response, Honeywell argued that the Newman patent should be distinguished based on the round shape of the Honeywell cover:

Claim 12 recites an annular adjustment means rotatably mounted substantially concentric with the apex of said convex shaped cover. The cover is circular and convex shaped. The Newman cover is neither circular shaped nor does it have an annular portion concentric with the apex of said circular cover.

Eco Mot. Summ. J., Ex. K at 4. Honeywell made the same point about Claim 9. The examiner was not convinced:

Claims 9 and 12 are each rejected as being unpatentable over Newman for reasons pointed out in the last office action. To make the cover in Newman of the particular shape disclosed by applicant would not amount to invention. Attention is called to the fact that the cover in Newman encloses the thermostat and the control means.

Eco Mot. Summ. J., Ex. H at 2.

Honeywell responded with a detailed argument to distinguish Newman based on what it described as the novelty and utility of the round, convex base and cover for Claims 9 and 12. Because Honeywell's argument is so important here, it is reproduced in full:

Claim 9 has been amended to further distinguish from the prior art of record in the application. The base is now recited as being round. The cover is now recited as comprising a stationary portion and a rotatable portion. The rotatable portion is adjustable for varying the condition value at which said thermostat may actuate the control means. *The cover being of a circular*

*convex shape and enclosing the thermostat and control means, presents a thermostat control means which is not only attractive in appearance but has great utility from a safety standpoint.* The employment of the convex-shaped cover embodies a shape of structure which does not present any edges or points which might cause injury to occupants, especially children who are susceptible to injury. This cover is spaced from the base to provide for circulation of air to the thermostat. The patent to Newmann [sic] discloses in a room thermostat a base of substantially rectangular contour and cover of substantially the same shape. The adjustment means 20 of the Newmann [sic] structure is so located in the cover as to present projecting edges therefrom. The cover further has pointed edges and the like as at 40 and 41 on the casing. The patent to Evans has a cover, but this cover does not enclose the thermostat or the control device associated with the thermostat. This cover also presents pointed surfaces. It is believed that the applicant is entitled to the structure set forth in this claim as it is not shown in the prior art or suggested therein. *Applicant had solved the problem of presenting an attractive control device and also one which considered the safety angle.* This claim is believed to be clearly allowable over the prior art.

Claim 12 is again presented for consideration. This claim embodies the features of claim 9 but they are presented in more detail. The adjustment means of claim 12 is recited as an annular adjustment means rotatably mounted substantially concentric with an apex portion of the convex-shaped cover. The structures recited in claim 12 are limited to a circular convex-shaped cover for enclosing the air condition means and the control means. *This claim recites a structure which considers the safety angle of the device.* That is, the claim presents a structure which does not embody any sharp edges or points so that persons coming in contact with the device cannot be injured. The annular adjustment means provides means on the circular convex cover which permits efficient and easy adjustment of the device, but still does not include any sharp edges or surface whereby a person could be injured. None of the prior art presents structures which considered this problem or even suggested the same. It is believed in view of these facts that the applicant is clearly entitled to this claim.

Eco Mot. Summ. J., Ex. I at 5–7 (emphases added).

On October 23, 1944, the examiner again rejected Claims 9 and 12 as unpatentable over the Newman patent, with its rectangular design. Eco Mot. Summ. J., Ex. J.

On April 2, 1945, Honeywell tried once more to distinguish the Newman patent. This time, Honeywell cancelled its proposed Claims 9 and 12 and submitted a new proposed Claim 33, which eventually was issued as Claim 23 of the '920 patent. Eco Mot. Summ. J., Ex. K. Honeywell explained:

This claim has been specifically drawn to avoid the disclosure of the Newman reference. Claim 33 [later 23] specifically calls for a round base for mounting condition responsive means and a control means. A circular convex shaped cover encloses the responsive means. The Newman reference does not have a round base but has an oblong or substantially rectangular base and the cover therefor is of substantially the same shape as that of the base portion of the room thermostat.

\* \* \*

Recapitulating in regards to the novelty of this claim over the Newman refer-

ence: (1)—Applicant has a round type thermostat comprising a round base having a circular convex shaped covering portion for enclosing a responsive means while the Newman reference discloses a rectangular shaped base having a rectangular shaped covering portion therefor. (2) Claim 33 sets out that the cover comprises a stationary portion and a rotatable portion while in the Newman reference, the cover portion 11 is entirely stationary. (3)—Claim 33 sets out that the rotatable portion has a circular periphery and the axis of rotation of the rotatable portion coincides with the center of the cover as a whole, while the adjusting disk 20 is spaced at one end of the cover of the room thermostat of the Newman device and the axis of rotation of the adjusting disk 20 does not coincide with the center of the cover as a whole.

*Id.* at 2–4. Honeywell concluded:

> Applicant has set forth a control device which has novel elements combined in a unique manner for accomplishing desirable results. The device is not only attractive in appearance but is useful and easily adjusted by anyone. It is thought that for the enumerated reasons set out above, this claim is clearly allowable over the references of record.

*Id.* at 4–5.[2]

On the basis of that submission, in 1946 the Patent Office issued the '920 patent with its Claim 23. By law, the '920 patent expired 17 years later, in 1963. The American public then had the right to practice the inventions claimed in the patent, including Claim 23.

### B. *The Design Patent*

In 1956, Honeywell obtained a design patent, D176,657 ("the '657 design patent") on the appearance of the round thermostat. See Ex. 257. The design patent shows a circular thermostat with a convex, rounded cover. In the center is a rotatable disc used to control the desired temperature. The disc is knurled or serrated around its circumference to make it easy to turn. The simple and elegant design is quite similar to those shown in the '920 utility patent, but the design patent puts the temperature control numbers inside the circumference of the serrated or knurled surface. The design patent had a term of 14 years and expired in 1970.[3]

### C. *Trademark Protection*

In 1968, as the '657 design patent was approaching expiration, Honeywell filed an application to register the shape of The Round thermostat. The application was denied by the examining attorney. Honeywell appealed to the TTAB, which affirmed the denial of registration. *In re Honeywell Inc.*, 169 U.S.P.Q. 619, 1971 WL 16480 (1971). The TTAB raised the issue of functionality but did not address it at that time. The TTAB reasoned that allowing the registration would improperly extend the 14–year monopoly on the design that had been granted in the design patent:

> Apart from any consideration as to whether applicant's configuration is es-

---

2. The Newman patent also noted the role of appearance in the cover of the thermostat: "Another object of the invention is to provide a casing structure of this character and having these advantages and which is simple and durable in construction and highly attractive in appearance...." Ex. 651 at 4, col. 1, *ll.* 49–53.

3. Compare attached Exhibit A, with figures 1 and 2 from the '920 utility patent, to Exhibit B, the '657 design patent. Also attached as Exhibit C is the drawing from the '108 trademark registration, and Exhibit D is a design patent issued to Eco showing its design of the Eco Stat.

sentially functional in character because it is formulated or designed to cover a round thermostat and is so arranged that the essential operating and temperature controlling and indicating mechanisms are visible to the operator thereof, registration must be refused on the ground that the registration sought by applicant would extend the monopoly which the applicant has enjoyed for a period of fourteen years from the issuance of the design patent on January 17, 1956.

\* \* \* \*

Since applicant's design patent expired in 1970, it is apparent that the issuance of a registration for the same subject matter, including the same mark and goods, would be inconsistent with the right of others under the terms of the patent grant to make fair use of the ornamental design for control instruments including thermostats after the expiration of the patent and that it would serve, in effect, to extend the protection accorded the patented design contrary to the purpose and intent of the patent law. See: *In re Deister Concentrator Company, Inc.*, 48 C.C.P.A. 952, 289 F.2d 496, 129 USPQ 314 (CCPA, 1961); *In re Shakespeare Company*, 48 C.C.P.A. 969, 289 F.2d 506, 129 USPQ 323 (CCPA, 1961); *In re Shenango Ceramics, Inc.*, 53 C.C.P.A. 1268, 362 F.2d 287, 150 USPQ 115 (CCPA, 1966); *Best Lock Corporation v. Schlage Lock Company*, 56 C.C.P.A. 1472, 413 F.2d 1195, 162 USPQ 552 (CCPA, 1969); and *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, 39 USPQ 296, 300–301.

169 U.S.P.Q. at 621.

Honeywell appealed the denial to the predecessor of the Federal Circuit, the Court of Customs and Patent Appeals, which remanded the case to the TTAB. *In re Honeywell, Inc.*, 497 F.2d 1344 (C.C.P.A.1974). The court held that the existence of a design patent did not necessarily foreclose the possibility of trademark protection for a non-functional design feature. *Id.* at 1348–49. The court remanded the case so that the TTAB could consider the alternative ground for denial, that the shape in question was functional and thus could not be protected by trademark.

On remand, the TTAB considered the issue and again denied registration, this time on the basis that the shape of the thermostat was functional. *In re Honeywell Inc.*, 187 U.S.P.Q. 576, 579, 1975 WL 21267 (TTAB 1975). The TTAB explained:

What applicant is seeking to register is essentially a protective cover for a round thermostat device which is so arranged that the essential operating and temperature controlling and indicating mechanism of the thermostat are visible to the operator. All of these characteristics are functional or utilitarian features of thermostat covers per se. The fact that both the cover and the thermostat are round does not detract from the functional characteristics thereof. In fact, it may add to the utilitarian aspects. There are only so many basic shapes in which a thermostat or its cover can be made [the cover usually would follow the shape of the thermostat for protective and aesthetic reasons] namely, squares, rectangles, or "rounds" with *the latter probably being and [sic] most utilitarian configuration of them all since the curvature of the inner ring with the serrated edges provides an easier and more comfortable method of making any necessary temperature adjustments.* This is demonstrated by the widespread use over the years of round-shaped control devices for appliances and similar equipment. The fact that thermostat covers may be produced in other forms or shapes does not and can-

not detract from the functional character of the configuration here involved. In sum, the overall configuration of applicant's thermostat cover, as presented for registration, is essentially functional in character and, as such, it does not possess the necessary attributes of a proprietary trademark necessary for registration. A registration thereof with the presumptions afforded under Section 7(b) of the Trademark Statute would be inconsistent with the avowed and desired purpose of preserving the freedom to copy functional features of a device long protected both under the common law and by statutory interpretation of what constitutes a registrable trademark. The most, therefore, that can be said of applicant's evidence of distinctiveness is that the design in question may have acquired a de facto secondary meaning. That is, a significance or recognition due to a lack of competition or other happenstance, but which is insufficient to support a legally protectable right therein. The happenstance in this case is that applicant's design patent was issued on January 17, 1956, the trademark application was filed on September 6, 1968, and the patent expired in 1970 during the pendency of the application and after the submission of the "evidence of distinctiveness."

187 U.S.P.Q. at 579–80 (emphasis added).

Honeywell appealed again, and the Court of Customs and Patent Appeals affirmed the denial of registration. *In re Honeywell, Inc.*, 532 F.2d 180, 182–83 (C.C.P.A.1976). The court quoted at length from the key passage of the TTAB decision (quoted above) and agreed with its analysis. *Id.* At that time, therefore, the shape of Honeywell's round thermostat was not protected by utility patent, by design patent, or by registered trademark.

In 1986, Honeywell tried again to register the shape as a trademark. The examiner attorney denied registration, finding that the shape was functional and that the doctrine of *res judicata* based on the prior denial barred registration. Honeywell appealed to the TTAB. This time the TTAB agreed with Honeywell and ordered what became the '108 registration. *In re Honeywell Inc.*, 8 U.S.P.Q.2d 1600, 1988 WL 252417 (TTAB 1988). That decision is discussed below in detail.

After the '108 registration was published for opposition, a major competitor filed to oppose the registration. Exs. 624; 627 at 010471–492. Emerson Electric makes the "White Rogers" line of thermostats. Emerson Electric told the TTAB that it would show that other competitors had in fact offered round thermostats for sale and that Honeywell had managed to use threats of litigation to discourage most competitors from selling round thermostats. Emerson Electric withdrew its opposition in 1990 as part of a larger settlement of patent and other intellectual property disputes with Honeywell. As a result, Emerson Electric's arguments and evidence were never considered by the TTAB in an adversarial proceeding. In this action, Eco has come forward with some of the same evidence that Emerson Electric submitted in its abandoned opposition to the '108 registration.

## IV. *Standard for Preliminary Injunction*

To obtain a preliminary injunction, the moving party must demonstrate that it is has a reasonable likelihood of ultimate success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if preliminary relief is denied. If the moving party passes that threshold, the court will then consider any irreparable harm an injunction would cause to the other parties, as well as the public interest, meaning the effects the

court's decision will have on non-parties. See *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir.2000); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992).[4]

## V. Likelihood of Success on the Merits: The '108 Trademark

### A. Functionality and "Incontestable" Trademarks

■ Under the Lanham Act, Honeywell's registration of the '108 mark became "incontestable." 15 U.S.C. §§ 1065, 1115. When a mark is "incontestable," the available defenses to an infringement claim are more limited than they would be otherwise. "Incontestable" is something of a misnomer, though, for the statute authorizes a number of defenses, including fraud, abandonment, license, antitrust violations, laches, estoppel, and acquiescence. *Id.*, § 1115(b). Most important for this case, the statute expressly provides as a defense: "That the mark is functional." *Id.*, § 1115(b)(8). For these purposes, a mark is functional if it protects a product feature that either is "essential to the use or purpose of the device" or "affects the cost or quality of the device." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). In terms of cost or quality, especially in a case involving so-called "aesthetic functionality," the question is whether giving one seller exclusive rights to a product feature would put competitors at a "significant non-reputation-related disadvantage." *Id.*

### B. Deference to the TTAB's Decision in the Ex Parte Proceeding?

■ Honeywell has urged the court not to look too closely at the issue of functionality. Honeywell relies heavily on the fact that it persuaded the Trademark Trial and Appeal Board to find that its circular convex shape was not functional and to issue the '108 registration. Honeywell argues that the TTAB's decision is entitled to substantial deference, especially in light of its expertise in the area. Such deference is not warranted in this case for four reasons.

First, the TTAB made its decision in an *ex parte* proceeding, without the benefit of a true adversary who had a strong incentive to present—and the ability to find—evidence that would have undermined Honeywell's arguments. Although the examining attorney argued her views to the TTAB, she did not have the resources, or the same capitalist incentive that competitors would have, to develop the case showing that the circular, convex shape is functional. The TTAB itself cautioned that its decision "would not preclude a different result, on a different record, in any subsequent *inter partes* proceeding which might arise as the result of the publication or registration of applicant's mark." *In re Honeywell Inc.*, 8 U.S.P.Q.2d 1600, 1604 n. 6, 1988 WL 252417 (TTAB 1988).

4. Like many parties seeking a preliminary injunction in the Seventh Circuit, Honeywell argues that it must show only a "better than negligible" chance of success on the merits. That phrase stems originally from Judge Posner's opinions in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir.1984), and *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982), which adopted the "sliding scale" approach to temporary injunctive relief. Although the "better than negligible" phrase appears often in Seventh Circuit opinions, few if any decisions have actually granted or affirmed preliminary injunctions based on a chance of success on the merits that a court found to be only "better than negligible." Where the balance of harms does not heavily favor the moving party, as here, the moving party must show at least a "reasonable likelihood" of success on the merits. *E.g., International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988).

Second, the TTAB applied the wrong legal standard to determine functionality. The TTAB asked whether the thermostat cover was "so utilitarian as to constitute a superior design which others in the field *need* to be able to copy in order to compete effectively." *Id.* at 1603 (emphasis added), quoting *In re Weber–Stephen Products Co.*, 3 U.S.P.Q.2d 1659, 1664, 1987 WL 124298 (TTAB 1987). In *Traf-Fix Devices*, the Supreme Court expressly rejected the "competitive need" standard adopted by the Federal Circuit and the TTAB, and by the Sixth Circuit in the case under review: "This was incorrect as a comprehensive definition. As explained in *Qualitex, supra,* and *Inwood [Laboratories, Inc. v. Ives Laboratories, Inc.], supra,* [456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)] a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device.... It is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of esthetic functionality.'" *TrafFix Devices, Inc.*, 532 U.S. at 33, 121 S.Ct. 1255. Also, the TTAB treated the existence of a utility patent that discloses utilitarian advantages of the design as merely one of four factors to be applied. *In re Honeywell Inc.*, 8 U.S.P.Q.2d at 1603, citing *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332 (C.C.P.A.1982). *TrafFix Devices* teaches, however, that such a utility patent is "strong evidence that the features therein claimed are functional," and that a party claiming trademark protection of such features "must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." 532 U.S. at 29–30, 121 S.Ct. 1255.[5]

Third, the TTAB did not have before it significant evidence of competitors' use of circular, convex thermostat designs, and it misread the little evidence it did have. The TTAB did not know that from 1969 to 1979, approximately, a company called Penn Controls, Inc. manufactured and sold a thermostat with a round cover. See Exs. 54 and 61. The cover of the Penn Controls thermostat was circular and convex, and was generally quite similar to Honeywell's round design—certainly similar enough to infringe the later '108 registered mark. The Penn Controls model had a baseplate that was essentially rectangular, but with curved sides that suggested a more circular shape. The Penn Controls thermostats were sold under several different labels. Tr. 363 (Daniels).

The TTAB also did not know that in June 1986, just after Honeywell applied for what became the '108 mark, Honeywell learned that a major competitor, the Hunter Fan Company, was introducing a thermostat with a round design. See Ex. 132. Honeywell's lawyers sent Hunter Fan a cease-and-desist letter claiming that Honeywell already had (unregistered) trademark rights in the round shape for thermostats. Ex. 113. Over the next year and a half, while Honeywell's application was being decided, lawyers for Honeywell and Hunter Fan sparred with threats and arguments over trademark and antitrust law. See Exs. 114–27. Honeywell insisted that "the overall circular appearance be avoided." Ex. 121 at 3. Eventually, Hunt-

5. In *Valu Engineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274–76 (Fed.Cir.2002), the Federal Circuit stated that *TrafFix Devices* did not alter the Federal Circuit's four-factor *Morton–Norwich* analysis for determining functionality. The Federal Circuit stated that it had not actually required proof of "compet- itive necessity" under the third *Morton–Norwich* factor, see *id.* at 1276, though the TTAB did apply a "competitive necessity" standard when it issued the '108 trademark, see *In re Honeywell Inc.*, 8 U.S.P.Q.2d 1600, 1603–04, 1988 WL 252417 (TTAB 1988).

er Fan agreed to drop its circular design, though the record in this case does not show a final written settlement agreement.

The TTAB apparently misunderstood evidence from which it could have realized that in 1985, a competitor called Quad Six, Inc. was manufacturing and selling a round thermostat that was, in Honeywell's words, "designed to replace Honeywell's Round T87F on a standard Honeywell Q539 subbase, with no revising required." Ex. 110 at 005971 (internal Honeywell analysis of Quad Six products). Honeywell described this and other Quad Six thermostats as "reliable and highly featured, and ... well accepted in the marketplace." *Id.* In early contacts between Honeywell and Quad Six, Honeywell claimed that it had unregistered trademark rights in the circular design, notwithstanding the TTAB's earlier refusal to register the mark. See Ex. 111 at 2. Honeywell also told Quad Six that it was preparing to apply again for a registered trademark on the round configuration. *Id.* Honeywell and Quad Six then entered into negotiations that resulted in Honeywell's acquisition of Quad Six in late 1985. That purchase by Honeywell effectively removed the competing round thermostat from the market.

Honeywell never told the TTAB in so many words that Quad Six had been selling its round thermostat in competition with Honeywell. The TTAB apparently viewed Quad Six only as an affiliate of Honeywell. Honeywell did submit evidence that could have enabled a very careful reader (but not a casual reader) to infer that Quad Six had been selling a competing round thermostat in 1985 for a few months before Honeywell acquired it. Ex. 627 at 010275–77 (Ruminsky Declaration ¶¶ 11–12). In approving the '108 registration, the TTAB relied heavily on what it believed was the *complete* absence of competing round thermostats:

Despite the apparent availability of the rounded thermostat cover since [1976], an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant [Honeywell] and its related companies. On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover.

8 U.S.P.Q.2d at 1604 (footnotes omitted).

Thus, the record before this court shows that the TTAB simply was not aware of critical evidence of competing round products, and that the TTAB misunderstood the evidence about Quad Six by overlooking the fact that Quad Six was selling a competing round product before Honeywell bought the company to eliminate that competing product. The evidence before this court also shows that whenever Honeywell learned that a competitor was selling or planned to sell a round thermostat, it responded with threats of expensive litigation, and it managed to eliminate the competing design either by settlements or by buying the competitor outright.

In short, the absence of competing round thermostats—which was the *sine qua non* of the TTAB's decision to reverse its prior decision and allow the '108 registration—was wrong as a matter of fact. Also, the actual small number of competing round thermostats, which the TTAB failed to acknowledge, was itself at best merely an artifact of aggressive lawyering and the intimidating power of Honeywell in the market. The absence certainly did not reflect a lack of interest by competi-

tors or an ability to compete fully without using the round shape.

The fourth reason that the TTAB's decision deserves no deference here is that the TTAB also misread the most important evidence before it: the '920 utility patent from 1946. The TTAB wrote about the '920 patent:

> The claims relate to the inner workings of the thermostat and, while applicant's cover configuration is designed to fit the shape of the inner workings, there is nothing of inherent utilitarian value about the circular, rounded shape of the cover. [fn2]
>
> [fn2] We note that the patents make references to the casing, and that one of the objectives of the invention was to avoid projecting parts and sharp edges. However, these references appear to be ancillary to the real claims of the invention, which involve the inner workings.

8 U.S.P.Q.2d at 1603 & n. 2. When the analysis focuses specifically on Claim 23, the TTAB's description of the shape as "ancillary to the real claims of the invention" simply does not hold water. As explained above, Claim 23 says nothing new about inner workings: it claims a thermostat with a thermometer, a switch, and a mechanism for setting the desired temperature. Claim 23 was allowed only because Honeywell convinced the patent examiner that the circular, convex shape was a new and useful improvement over the prior art. See Part III–A, *supra.*

Because the TTAB made its decision to issue the '108 registration in *ex parte* proceedings that applied the wrong legal standard to a factual record that was both incomplete and misinterpreted on critical issues, concerning both competition and the expired utility patent, the TTAB's decision is not entitled to substantial deference by this court.

## C. *Eco's Functionality Defense*

### 1. *The Standard for Functionality and TrafFix Devices*

The functionality doctrine has marked the critical boundary between patent law and trademark law since at least Justice Brandeis' opinion in *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). The Court held in *Kellogg* that the National Biscuit Company did not have exclusive rights to use the name "shredded wheat" or—in what we would now call the product configuration part of the case—to sell shredded wheat cereal in the distinctive pillow-shaped biscuit that had become so well known to the public. National Biscuit's utility patent on machines to produce shredded wheat had expired long before. The pillow shape had been produced by the patented machines and had also been the subject of an expired design patent.

The Court reasoned that the public had a right to practice the expired utility patent, which included the use of the shape that was produced by practicing the patented invention:

> The plaintiff has not the exclusive right to sell shredded wheat in the form of a pillow-shaped biscuit—the form in which the article became known to the public. That is the form in which shredded wheat was made under the basic patent. The patented machines used were designed to produce only the pillow-shaped biscuits. And a design patent was taken out to cover the pillow-shaped form. Hence, upon expiration of the patents the form, as well as the name, was dedicated to the public.

*Kellogg Co.,* 305 U.S. at 119–20, 59 S.Ct. 109. *Kellogg* followed the reasoning of *Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1896), which held that competitors could practice

the invention of an expired patent for sewing machines, including the form or shape of the machines, so long as they marked the source of their machines. The Court explained in *Singer*:

It is self-evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.

163 U.S. at 185, 16 S.Ct. 1002; accord, *Coats v. Merrick Thread,* 149 U.S. 562, 572, 13 S.Ct. 966, 37 L.Ed. 847 (1893) (competitor could practice expired patent despite some potential for confusion as to source).

The Supreme Court addressed this old problem most recently in *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). The Court affirmed a district court's grant of summary judgment finding that the claimed trademark covered supposed "trade dress" that was actually functional. The claimed mark was a product configuration that had been the subject of an expired utility patent. The product in question was a frame to hold highway signs, with two springs attaching the sign to its base to allow the sign to flex in high winds. After the patent expired, the patentee claimed that it had trade dress rights in the distinctive two-spring design, which customers had come to associate with the patentee.

The Supreme Court summarized its reasons for affirming the district court's grant of summary judgment on grounds of functionality:

The principal question in this case is the effect of an expired patent on a claim of trade dress infringement. A prior patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

532 U.S. at 29–30, 121 S.Ct. 1255. Applying this principle, the Court explained that the dual-spring design had been the central advance claimed by the expired utility patents and was "the essential feature" of the claimed trade dress. The patentee could not overcome "the strong evidentiary inference of functionality based on the disclosure of the dual-spring design in the claims of the expired patents." *Id.* at 30, 121 S.Ct. 1255.

The Court further explained that the Sixth Circuit, which had reversed the district court on the trade dress claim, had applied an erroneous standard in deciding functionality. Like some other circuits, the Sixth Circuit had apparently thought that the test for functionality was "whether the particular product configuration is a competitive necessity." *Id.* at 32, 121 S.Ct. 1255. That test, the Supreme Court said, was too narrow, although competitive necessity would certainly prove functionality. But "a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *Id.* at 33, 121 S.Ct. 1255.

Because the dual-spring design was not "an arbitrary flourish" but was the reason the device worked, the design was functional and could not be protected as trade dress. *Id.* at 34, 121 S.Ct. 1255.

*TrafFix Devices* guides this case. It treated the expired utility patent as "strong evidence" of functionality, and it shows that a feature can be functional if it "affects the cost or quality of the device." *Id.* at 33, 121 S.Ct. 1255. In cases of aesthetic functionality, if exclusive use by one competitor of the feature would put others at a "significant non-reputation-related disadvantage." *Id.*, quoting *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

### 2. *Evidence Regarding Functionality*

#### a. *The Utility Patent*

■ The strongest evidence of functionality in this case is Claim 23 of the long-expired '920 patent, further bolstered by its prosecution history. As explained above in Part III–A, Claim 23 protects a thermostat design for which the round, convex shape was the novel, useful, and non-obvious invention. Honeywell obtained issuance of Claim 23 by focusing on the round shape as safe, compact, and attractive. The Patent Office ultimately agreed with those arguments and approved the claim, thus treating that shape as a *useful* invention and not as, in the words of *TrafFix Devices,* an "arbitrary flourish" in the design.

After the '920 patent expired, the public had a right to practice the disclosed invention. That right included the right to use the round base, the circular, convex cover, and the rotatable control dial in the center of the cover.

Granting Honeywell's motion for a preliminary injunction would recognize broad trademark rights that would effectively prohibit the public from practicing the invention of Claim 23. Honeywell's evidence shows that many customers associate the round shape with Honeywell. Honeywell is claiming in essence that the '108 trademark should bar competitors from selling virtually any round thermostat because any round thermostat would be seen as a Honeywell product. Where recognizing a trademark right in a product configuration would prevent the public from practicing a useful invention that was the subject of an expired utility patent, the trademark is not valid because what it protects is a functional design or feature of the product. The trademark claim must give way to the public's rights under the patent bargain with inventor: exclusive rights for a limited period of time, followed by a public right to practice the invention. See *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 2048, 156 L.Ed.2d 18 (2003) (recognizing right to copy after patents or copyrights expire); *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. at 165, 115 S.Ct. 1300 (even if customers had come to identify special useful shape of light bulb with a particular manufacturer, the manufacturer may not use the shape as a trademark after the patent expired); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (recognizing right to copy after patent expires); *Kellogg Co. v. National Biscuit Co.*, 305 U.S. at 119–20, 59 S.Ct. 109 (same).

#### b. *Aesthetic Functionality*

Even without Claim 23 of the '920 patent, Honeywell's round design would still satisfy the Supreme Court's and the Seventh Circuit's standard for aesthetic functionality. On this issue, the Supreme Court's decision in *Qualitex* is most instructive. *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). The Court held

there that a manufacturer of dry cleaning press pads could register a particular color as a trademark for its products where the color served no purpose other than to identify the source of the product. *Id.* at 174, 115 S.Ct. 1300. The fact that the color served no purpose other than identification was critical. The *Qualitex* Court recognized that color sometimes plays an important role in making a product more desirable. The Supreme Court noted, for example, that competitors may be free to copy the color of a medical pill where the pill serves to identify the type of medication. The Court also noted that lower courts had permitted competitors to copy the green color of farm machinery because customers wanted their farm equipment to match, and had barred the use of black as a trademark on outboard motor boat motors because black decreases apparent size and ensures compatibility with many different boat colors. *Id.* at 169–70, 115 S.Ct. 1300 (citing cases).

Most important for present purposes, the Court in *Qualitex* emphasized that color could be functional even if the only function was to make the product more attractive to customers:

> The upshot is that, where a color serves a significant non-trademark function— whether to distinguish a heart pill from a digestive medicine or to satisfy the "noble instinct for giving the right touch of beauty to common and necessary things," G. Chesterton, Simplicity and Tolstoy 61 (1912)—courts will examine whether its use as a mark would permit one competitor (or a group) to interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient.

*Id.* at 170, 115 S.Ct. 1300; accord, *Publications Int'l, Ltd. v. Landoll, Inc.,* 164 F.3d 337, 339 (7th Cir.1998) (recognizing aesthetic functionality and stating: "A producer

cannot in the name of trade dress prevent his competitors from making their products as visually entrancing as his own."); *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 338–40 (7th Cir.1985) (recognizing aesthetic functionality).

This analysis also applies to shape. Thermostats work equally well to control temperature regardless of shape, but the evidence shows that shape and overall appearance are important features in selling thermostats. A thermostat is a utilitarian device, one of those "common and necessary things," in Chesterton's words, but it is also part of an interior decor. See *Qualitex Co.,* 514 U.S. at 170, 115 S.Ct. 1300, quoting G. Chesterton, Simplicity and Tolstoy 61 (1912). Consumers prefer attractive designs over ugly ones. Tr. 272–76 (Tisthammer).

The aesthetic dimension of thermostats is well recognized in the business, of course. Honeywell and other manufacturers tout their residential products as attractive and as suitable for any decor. See, *e.g.,* Ex. 623 at 000930 (Honeywell market research showing that overall appearance, including shape, plays a critical role in consumers' initial response to products); Ex. 638 at col. 1, *ll.* 22–24 (U.S. Patent No. 5,943,917 issued to Honeywell for thermostat: "One shape or the other may be preferred for no other reason than personal choice or greater compatibility with the decor of the room . . . ."); Ex. 187 (Honeywell advertisement emphasizing aesthetic appeal of round design); Ex. 193 at 009620, 009631 (other manufacturers' advertisements emphasizing aesthetic appeal).

At trial, Honeywell tried to avoid a finding of aesthetic functionality by showing that consumers find the round design less attractive than rectangular designs. This effort was not persuasive. Shape is a matter of personal preference, as Honeywell

itself has said. Also, Honeywell itself has made the round shape its flagship model, and it has repeatedly promoted the attractive appearance of its round thermostats from its patent application in the 1940s through its current advertising. That record is more credible than Honeywell's new "spin" in litigation, trying to present the round design as the ugly duckling of the industry it leads. The evidence before the court does not show that a majority of consumers prefer round thermostats over rectangular or square ones. It does indicate, however, that a substantial minority of consumers have a preference for round. See Tr. 294–97 (Tisthammer); Ex. 197 at 003999. This preference can also be inferred from the fact that Honeywell has sold about 85 million of its round thermostats, and it still sells between 1.5 and 2.5 million units every year. Ex. 205 at 000323. Even stronger support for the aesthetic preference is the fact that Honeywell can sell its round model for a much higher price than its price for its equally functional and reliable—but rectangular—T834 model. See *id.*; Tr. 367–68 (Daniels).

Also, when any of the millions of existing round Honeywell thermostats need to be replaced, a round thermostat of the same size has a competitive advantage over other shapes. When a thermostat has been on a wall for many years, there is a noticeable difference between the color of the wall paint or wallpaper under the thermostat and that next to the thermostat. The round replacement should avoid the need for trimming wallpaper or repainting.

Honeywell has emphasized the fact that its round thermostats are slightly more expensive to manufacture than its comparable rectangular thermostats. Exs. 205, 213, Tr. 125–27 (Stoner), 339–40 (Tisthammer) (T87 and base cost approximately 35 cents more to manufacture than the T834 rectangular model with identical functions). Thus, argues Honeywell, the round shape does not have a positive effect on cost or quality. The argument overlooks the fact that the price difference for the shapes is far greater than the manufacturing cost difference. Round thermostats cost five percent more to manufacture but the price difference between the two shapes is much greater than five percent. The round thermostats clearly have an advantageous quality that leads many customers to pay a premium for millions of them.[6]

In short, Honeywell's round thermostat design is aesthetically appealing to a substantial portion of consumers. That feature therefore positively affects the "quality" of the product, independent of any association between the shape and the source of the product. If the court were to recognize exclusive rights to the round shape, which is no longer protected by the expired utility patent and design patent, those rights would put other competitors at a disadvantage not related to reputation. The shape meets the standards for aesthetic functionality and may not be trademarked.

### c. *Estoppel to Deny Functionality*

A third and independent ground for finding that Honeywell's round design is functional is estoppel, based on the asser-

6. See also *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1007 (9th Cir. 1998) (rejecting argument similar to Honeywell's, where holder of expired patent claimed trade dress protection and argued that the feature was not functional because it provided a utilitarian *dis*advantage). Honeywell's attempt to explain the price differences in terms of brand preferences also is not persuasive. The comparison in the evidence was between two Honeywell products that differ only in terms of shape.

tions of utility that Honeywell made to obtain the '920 patent. In *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1008 (9th Cir.1998), the Ninth Circuit took that approach in affirming summary judgment, holding that a feature in an expired utility patent was functional and thus not protected trade dress. The court explained: "A trademark proponent cannot create an issue of material fact regarding a shape's functionality, and thus survive summary judgment, by contradicting an earlier assertion contained in an expired utility patent that the same shape is functional." *Id.* In support, the court cited 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7.89, at 7–208 (4th ed.1998), and the more general principle from summary judgment practice that a party cannot create a genuine issue of material fact by submitting an affidavit that merely contradicts her earlier sworn deposition testimony. Accord, *e.g., Sparklets Corp. v. Walter Kidde Sales Co.,* 26 C.C.P.A. 1342, 104 F.2d 396, 399 (C.C.P.A.1939) (affirming denial of trademark registration for product feature claimed in utility patent: "It is perfectly evident that the groove was at least believed by the patentee to have utility at the time of making application . . . ."). The same reasoning applies here to the sworn claims of the round shape's utility that Honeywell made to secure issuance of Claim 23 of the '920 patent.

### 3. *Honeywell's Effort to Distinguish TrafFix Devices*

Honeywell argues that *TrafFix Devices* is distinguishable on three grounds. First, *TrafFix Devices* put the burden of proof on the issue of functionality on the party claiming the trademark protection. 532 U.S. at 29, 121 S.Ct. 1255, citing 15 U.S.C. § 1125(a)(3). Honeywell contends that its "incontestable" registered trademark puts the burden of proof on Eco. For purposes of the present decision, the court has as-sumed that Honeywell is correct on this point. However, Eco has sustained its burden of proof on the issue of functionality, so this difference between the cases has no effect.

Second, Honeywell points out that the utility patent in *TrafFix Devices* had expired only six years before the lawsuit began, while Honeywell's utility design expired 40 years ago in 1963. Honeywell has not developed this argument in detail, and the passage of time does not undermine the weight of Eco's evidence of functionality. After the expiration of the '920 patent, the public had a right to copy and practice the claimed invention, including the round design of Claim 23. The Supreme Court rejected a very similar argument based on delay in *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). The plaintiff argued that Kellogg had not tried to make shredded wheat for many years after the plaintiff's utility patents expired, during which time plaintiff had spent a great deal of money advertising the product so as to identify itself as the source of "shredded wheat." Justice Brandeis wrote for the Court:

> Those facts are without legal significance. Kellogg Company's right was not one dependent upon diligent exercise. Like every other member of the public, it was, and remained, free to make shredded wheat when it chose to do so; and to call the product by its generic name. The only obligation resting upon Kellogg Company was to identify its own product lest it be mistaken for that of the plaintiff.

*Id.* at 119, 59 S.Ct. 109. The same reasoning applies here.

Third, Honeywell points out that *TrafFix Devices* dealt with a feature that was described as the "central advance" of the utility patent and as "necessary to the operation" of the product. See *TrafFix*

*Devices*, 532 U.S. at 30, 121 S.Ct. 1255. In a colloquial sense, because one can make a thermostat in a different shape that controls temperature just as well as The Round, the circular, convex shape admittedly seems less important or useful than the two-spring design at issue in *TrafFix Devices*. The central point remains, however, that Claim 23 of the '920 patent issued *only* because Honeywell convinced the Patent Office that the circular, convex shape was both useful and novel as compared to the prior art. Honeywell argued that its design was safe, compact, and attractive. Its success in making those arguments brings this case squarely within the reasoning of *TrafFix Devices*. In the language of *TrafFix Devices*, the round shape was the "central advance" of Claim 23, and was not merely "arbitrary, incidental, or ornamental" to the invention of Claim 23. *Id.*

### 4. *Honeywell's Additional Arguments on Functionality*

Honeywell has raised a number of objections to any finding of functionality in this case. Most of them are answered by a careful reading of *TrafFix Devices*.

■ First, Honeywell has emphasized the fact that Eco began designing its round Eco Stat product by trying essentially to copy Honeywell's T87 design. Although intent to copy is relevant in trademark law, that intent is not relevant if the design in question is functional. *TrafFix Devices* involved the copying of the product in question, and it was even sent overseas for the reverse engineering and manufacturing. 532 U.S. at 26, 121 S.Ct. 1255. The same facts are present here. They did not matter in *TrafFix Devices*, and they do not matter here.[7] *TrafFix Devices* also repeated the Supreme Court's teachings that "copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *Id.* at 29, 121 S.Ct. 1255, citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (holding that federal patent law established right to copy product designs and that federal law preempted state law purporting to protect boat hull designs).

Honeywell also argues that there are many other shapes available for Eco to use in making its mercury-free thermostat, though the only commercially practical ones are all variations on squares and rectangles. See Ex. 300. *TrafFix Devices* shows that the availability of other design possibilities also does not defeat the functionality defense to trademark infringement. In *TrafFix Devices*, the district court had found the design in question to be one of a limited number of superior designs. That did not convince the Sixth Circuit, because its use was not "a competitive necessity." The Supreme Court soundly rejected that approach: "the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used." 532 U.S. at 33–34, 121 S.Ct. 1255. In this case, the evidence shows that all successful thermostat designs have been either round or essentially rectilinear in shape. There is considerable variety in the proportions and design details of the many rectangular or square designs, but the fact remains that only those two basic shapes are com-

7. The new competitor in *TrafFix Devices* had used a confusingly similar name for its product, as to which an intent to copy the product would be relevant under the Lanham Act regarding likelihood of confusion. That issue was not before the Supreme Court, which limited its consideration to the claim of trade dress infringement based on the product configuration or design. In this case, Eco has not adopted a confusing name, symbol, or packaging for its Eco Stat product. Honeywell's claims are based only on the appearance of the product, focusing on the circular and nearly convex shape.

petitively viable, and Honeywell's theory would effectively give it eternal and exclusive rights to use a round design.

Honeywell has understandably emphasized both its own substantial investments in the round design and the close association in the public's mind between that shape and Honeywell as the source of the product. Because Honeywell has been the exclusive source of round thermostats for so long, such close identification—which amounts to "secondary meaning" for purposes of trademark law—is not surprising. As Judge Shadur noted in a similar case, it is after all "no great trick to build up secondary meaning in a product configuration if [competitors] are kept from utilizing that configuration for 17 years by the sword and shield of patent protection." *Zip Dee, Inc. v. Dometic Corp.*, 931 F.Supp. 602, 615 (N.D.Ill.1996). When one adds the use of a design patent for another 14 years of protection, and after that some aggressive lawyering to claim trademark rights and discourage competitive use of the design, the secondary meaning can become even stronger.

■ Thus, for purposes of deciding functionality, the court assumes that there is a substantial risk of confusion about source when Eco first introduces its round product. However, *TrafFix Devices* explains that this risk does not affect the result on the decisive issue of functionality: "The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller.... MDI cannot gain the exclusive right to produce sign stands using the dual-spring design by asserting that consumers associate it with the look of the invention itself." 532 U.S. at 34–35, 121 S.Ct. 1255. Similarly, the fact that years of advertising and exclusive use of the shape have led many buyers to associate the round design with Honeywell does not entitle Honeywell to perpetual and exclusive use of this functional product design.[8]

■ Finally, Honeywell argues that the court should not even consider the defense of functionality because it would "retroactively" diminish Honeywell's rights in its registered '108 trademark. Congress amended the Lanham Act statute in 1998 to state explicitly that one defense to claims of infringement of even an "incontestable" registered trademark is that the mark is "functional." See 15 U.S.C. § 1115(b). Honeywell argues that the 1998 legislation cannot be applied to this case because its '108 registration became incontestable before the 1998 legislation. The 1998 legislation provided that the amendment applied only to civil actions commenced on or after October 30, 1998. Trademark Law Treaty Implementation Act, Pub.L. No. 105–330, § 201(b), 112 Stat. 3064 (1998) (codified as amended at 15 U.S.C. § 1051 *et seq.*). Accordingly, this action is covered by the 1998 legisla-

---

8. Just before Honeywell obtained the '920 patent, the Supreme Court taught:

By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly. Hence we have held that the patentee may not exclude the public from participating in

that good will or secure, to any extent, a continuation of his monopoly by resorting to the trademark law and registering as a trademark *any particular descriptive matter appearing in the specifications, drawings or claims of the expired patent, whether or not such matter describes essential elements of the invention or claims.*

*Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256, 66 S.Ct. 101, 90 L.Ed. 47 (1945) (emphasis added).

tion expressly authorizing the defense of functionality for incontestable trademarks.

Honeywell has made a half-hearted effort to suggest that applying the functionality defense to its '108 registration would amount to an unconstitutional taking of private property for public purpose. The argument fails on several levels.

First, Supreme Court authority and the weight of lower-court authority prior to 1998 show that trademark law never authorized protection of functional product features. See, *e.g.*, *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164–65, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332, 1336 (C.C.P.A.1982); *In re Deister Concentrator Co.*, 48 C.C.P.A. 952, 289 F.2d 496, 505 (C.C.P.A.1961); and cases cited in these opinions.[9]

Second, Honeywell argues that the law was settled *in the Seventh Circuit* prior to 1998 that an incontestable trademark could not be challenged on grounds not listed in the statute, citing *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 376–377 (7th Cir.1976). *Union Carbide* did not involve a defense of functionality, though, and it did not address the critical role that functionality plays in maintaining the boundary between patent law and trademark law, which the Seventh Circuit had recognized in many cases, including *Vaughan Mfg. Co. v. Brikam Int'l Inc.*, 814 F.2d 346, 349 (7th Cir.1987), and *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 338 (7th Cir.1985). Even if Honeywell's reading of Seventh Circuit decisions were correct,

such circuit law on a controversial issue— especially when it is later shown and held to be inconsistent with Supreme Court law—cannot establish protected property rights in a trademark on a functional product feature.

Third, Honeywell has not cited any remotely comparable authority holding that recognizing a defense to a trademark amounted to a taking of private property. Fourth, and perhaps most fundamental, Honeywell's own *patent bargain* with the public when the '920 patent issued in 1946 was that the public would be entitled to practice the claimed invention beginning in 1963. It is Honeywell who is trying to renege on a bargain here.

If there were any merit to Honeywell's retroactivity argument, the case would present the constitutional issue that the Supreme Court chose not to decide in *TrafFix Devices.* See 532 U.S. at 35, 121 S.Ct. 1255. The patent clause of the Constitution, Article I, Section 8, clause 8, provides that Congress shall have the power: "To promote the progress of science and useful arts, by securing *for limited Times* to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The constitutional argument is that the patent clause of its own force prohibits Congress from allowing the holder of an expired utility patent to claim trade dress protection for the subject of the patent. See *TrafFix Devices,* 532 U.S. at 35, 121 S.Ct. 1255; see also *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d

---

**9.** The legislative history of the 1998 amendment indicates that functionality was always deemed a defense even to "incontestable" trademarks: "The language clarifies that matter which is wholly functional must be refused registration, a position that is completely consistent with the intent of the Trademark Act. This change codifies both the case law in this matter and the long-standing practice of the Office to refuse registration to matter that is

wholly functional based on a combined reading of sections 1, 2 and 45 of the Trademark Act." 144 Cong. Rec. S6564–03, S6573 (June 18, 1998) (summary of introduced bill by Sen. Hatch). The legislation itself also described the addition of functionality as a "technical" amendment. Trademark Law Treaty Implementation Act, Pub.L. No. 105–330, § 201, 112 Stat. 3064 (1998) (codified as amended at 15 U.S.C. § 1051 *et seq.*).

1204, 1207–08 (11th Cir.1999) (patent clause requires functionality doctrine under trademark law); *Shakespeare Co. v. Silstar Corp. of America, Inc.,* 9 F.3d 1091, 1099 (4th Cir.1993) (Niemeyer, J., dissenting) (same).

Honeywell argues in this case that even if its round, convex shape was functional when the '920 patent issued in 1946, advances in technology over the past 50 years mean that the shape is no longer functional, that it no longer provides a competitive advantage apart from signaling that Honeywell is the source of the product. This court disagrees with that view, but if a higher court were to adopt that view of the shape, or if there were a retroactivity bar to use of the functionality defense here, then the constitutional question would be squarely (no pun intended) presented. See *Wilhelm Pudenz, GmbH,* 177 F.3d at 1207–08; 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7.84 (4th ed.2003).

D. *Eco's Defense of Fraud on Trademark Office*

Eco also contends that Honeywell committed fraud on the Patent and Trademark Office in prosecuting what became its '108 trademark registration. "Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *Torres v. Cantine Torresella S.r.l.,* 808 F.2d 46, 48 (Fed.Cir.1986) (affirming TTAB's cancellation of trademark for fraudulently obtaining registration); see also *Oreck Corp. v. Thomson Consumer Electronics, Inc.,* 796 F.Supp. 1152, 1160 (S.D.Ind.1992) ("Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark."), quoting *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670 (7th Cir.1982). In the Seventh Circuit, fraud must be shown by clear and convincing evidence. *Money Store,* 689 F.2d at 670.

■■■ Before addressing the merits of the defense, a word is in order about its limited significance. The Lanham Act provides that a registered trademark may be cancelled on the ground that "its registration was obtained fraudulently." 15 U.S.C. § 1064(3). When a registration is cancelled, however, the trademark itself is not necessarily invalid or unenforceable. "Trademarks are created by use, not registration. Federal registration creates valuable substantive and procedural rights, but the common law creates the underlying right to exclude. Thus, even if a plaintiff's registration is shown to be fraudulently obtained, the plaintiff's common law rights in the mark may still support an injunction against an infringing defendant." *Aveda Corp. v. Evita Marketing, Inc.,* 706 F.Supp. 1419, 1425 (D.Minn.1989); accord, *Zip Dee, Inc. v. Dometic Corp.,* 900 F.Supp. 1004, 1009 (N.D.Ill.1995) (trademark rights exist "from the fact of use and the common law, independently of registration in the Patent Office"), quoting *Morehouse Mfg. Corp. v. J. Strickland & Co.,* 56 C.C.P.A. 946, 407 F.2d 881, 888 (C.C.P.A.1969). Thus, if Eco prevails on its fraud defense, the effect would be to deny Honeywell the procedural benefits of the incontestable registration, such as shifting the burden of proof on functionality from Eco back to Honeywell. See *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (party seeking trademark protection has burden of proving non-functionality). But an otherwise valid trademark could still be enforced.

1. *Honeywell's False Statements*

Eco has come forward with substantial evidence showing that Honeywell made factually false statements to the PTO in

pursuing the '108 registration. To overcome the prior rejection on grounds of functionality, Honeywell built its 1986 application on a key factual foundation: that no competitors had used a circular and rounded design in the 16 years since the design patent had expired. The evidence here shows that in fact several competitors had marketed similar round thermostat designs during that period.

In a brief dated October 10, 1986, Honeywell stressed the supposed fact that no competitor had used a round design since the design patent had expired:

> Sixteen years have passed since Applicant's design patent expired. *Competitors have been free to copy this unprotected round thermostat design for sixteen years*, but the trade literature exhibits and declaration submitted with the Application show that *no one in the trade adopted this round design for their thermostats during the many years after the patent and the filing of this application.* If the round design was de jure functional or "the best or one of a few superior designs available", *surely some of Applicant's competitors would have adopted this round design during those many sixteen years.* The fact that competitors have not used this design and have not been hampered in their competition with Applicant is convincing proof of the nonfunctionality of Applicant's thermostat design.

Ex. 627 at 010320 (emphasis added). Honeywell also stated that there had "been no settlement agreements involving this configuration. . . ." *Id.* at 010324. As the application proceeded through further review, Honeywell repeatedly made this point, in its request for reconsideration filed on July 29, 1987, *id.* at 010358, in its brief on appeal filed January 19, 1988, *id.* at 010414–415, and in its reply brief filed April 28, 1988, *id.* at 010532. Honeywell's

reply brief described the complete absence of competing round designs as "the most compelling evidence of nonfunctionality possible," stating that "no competitors for the past 17 years have manufactured thermostats with round covers, *even though they were entirely free to do so.*" *Id.* at 010535 (emphasis added).

In fact, the evidence before the court shows—clearly and convincingly—that these assertions were wrong as a matter of fact. The court has summarized in Part V–B, *supra,* the evidence showing that Penn Controls and Quad Six had both marketed circular, convex thermostats before Honeywell filed its 1986 application, and that Hunter Fan was marketing a circular, convex thermostat while Honeywell was pursuing its application and arguing that no competitors were using round designs.

### 2. *Materiality and Reliance*

It is equally clear that the false statements about the absence of competing round thermostats were material to the application and the TTAB's decision. The examining attorney repeatedly asked for detailed information about competitors' designs and even settlement agreements regarding competing round designs. The TTAB expressly relied upon Honeywell's false statements in deciding to issue the '108 registration. First, despite the earlier denial of registration for the round design, the TTAB decided not to apply the doctrine of *res judicata* because of Honeywell's evidence of the absence of competing round designs in the intervening years. 8 U.S.P.Q.2d at 1602–03. Second, in applying the third *Morton–Norwich* factor addressing the availability of alternative designs to competitors, the TTAB emphasized Honeywell's evidence:

> Despite the apparent availability of the rounded thermostat cover since that

*time* [1976], an availability that provided more than the usual degree of certainty that the design did not enjoy either patent or trademark protection, *the Examining Attorney has been unable to provide evidence of the use of a rounded circular cover configuration by any party other than applicant and its related companies.* On the contrary, applicant has provided extensive evidence of its competitors' various thermostat designs, and in none of the various catalogues and other literature are there any thermostats having a circular cover. *The mere fact that the number of alternative designs is limited is not a per se bar to the registration of a particular configuration, but must be viewed in the context of the entire record presented.*

*Id.* at 1603–04 (emphasis added).[10] Thus, the TTAB's opinion itself shows that the lack of any competitors producing round thermostats was material—was in fact decisive—in the issuance of the '108 registration.

During closing arguments on the motion for preliminary injunction, Honeywell argued that even if a few competitors had in fact used round, convex thermostat designs, such evidence would not have been material to the TTAB's decision. The TTAB's own opinion—which repeatedly emphasized the *complete* absence of competing round designs—rebuts that argument.

### 3.   *Knowing and Willful Deceit?*

The foregoing facts are sufficient to undermine any suggestion that this court should defer to the TTAB's decision, which was based upon demonstrably incorrect facts. To establish the defense of fraud, however, Eco must also establish by clear and convincing evidence that Honeywell knew it was making false statements to the

PTO and that it did so willfully, with intent to deceive. Inaccurate or misleading statements are not enough. "Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark." *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670 (7th Cir.1982). " 'If it can be shown that the statement was a 'false representation' occasioned by an 'honest' misunderstanding, inadvertence, negligent omission or the like rather than one made with a willful intent to deceive, fraud will not be found.' " *Oreck Corp. v. Thomson Consumer Electronics, Inc.,* 796 F.Supp. 1152, 1159 (S.D.Ind.1992), quoting *Citibank N.A. v. Citibanc Group, Inc.,* 215 U.S.P.Q. 884, 902 (N.D.Ala.1982), in turn citing *Smith Int'l, Inc. v. Olin Corp.,* 209 U.S.P.Q. 1033, 1043–44, 1981 WL 48127 (TTAB 1981).

*Penn Controls:* Eco has not come forward with clear and convincing evidence that Honeywell knew in 1986 about the Penn Controls products that were marketed from 1969 to 1979, with a catalog listing as late as 1981. Surely no company knew the thermostat market better than Honeywell. Still, the court does not have enough evidence to find that the omission of information about the Penn Controls products was knowingly and willfully deceitful.

*Quad Six:* The TTAB stated incorrectly in its decision that only Honeywell and "its related companies" had used a rounded circular thermostat cover. *In re Honeywell Inc.,* 8 U.S.P.Q.2d 1600, 1604, 1988 WL 252417 (TTAB 1988). After reviewing Honeywell's statements regarding Quad Six, it is easy to see how the TTAB made this mistake. Honeywell supported its repeated statements that no competitor had ever adopted the round design during the previous sixteen years by the Kris Rumin-

---

**10.**   Under the *Morton–Norwich* test, "the effect upon competition 'is really the crux of the

matter.' " *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1341 (C.C.P.A.1982).

sky Declaration, which was dated April 30, 1986. Ruminsky reported on a comprehensive survey of trade literature that she had conducted. See Ex. 627 at 010273–278 (Ruminsky Declaration); Ex. 106 (Exhibit Y to the Ruminsky Declaration). Ruminsky signed the declaration under oath after being warned that false statements would be criminal and would jeopardize the application.

Ruminsky told the TTAB about the Quad Six product, but she never said that Quad Six had sold a round thermostat that competed with Honeywell. Only a very careful reader would have inferred that Quad Six had been selling its competing product *before* Honeywell acquired the company. Ruminsky did not actually describe the Quad Six product. Instead, in a long list of statements identifying small competitors' advertisements, she stated: "An advertisement entitled 'MAGIC–STAT ALL SEASONS' produced by Quad Six, Inc. is identified as Ruminsky Exhibit X.* Advertisements and brochures relating to MAGIC–STAT thermostats of Quad Six, Inc. are identified as Ruminsky Exhibit Y.* " Ex. 627 at 010275, ¶ 11(n)-(*o*) (Ruminsky Declaration). The asterisk referred the reader to a note immediately below stating: "Subsequent to my review or survey of this trade literature, Quad Six, Inc. (the company identified with Exhibits W, X, and Y) was acquired by Honeywell, Inc." *Id.* at 010276. That was the only indication that would allow the careful reader to infer that Quad Six had sold a competing round thermostat before Honeywell acquired it.

Ruminsky continued:

To my knowledge, there are no competitors of Honeywell, Inc. producing thermostats of a circular-rounded configuration similar to the distinctive thermostat design of Honeywell Inc. shown in the above-identified U.S. trademark application. Further, my exhaustive review of

the above-identified trade literature of competitors does not disclose any circular-rounded thermostat design similar to the distinctive design of Honeywell Inc. The only thermostat similar to that of Honeywell, Inc. is shown in the Quad Six brochure identified as Ruminsky Exhibit HH. As indicated, such company is a wholly-owned subsidiary of Honeywell Inc.

*Id.* at 010277, ¶ 12. With the careful use of the present tense—"there *are* no competitors," and "such company *is* a wholly-owned subsidiary"—Paragraph 12 was literally correct but seems to have been designed to leave the wrong impression by not stating plainly that Quad Six had sold its round thermostat in competition with Honeywell. Moreover, Ruminsky then made a broader statement that was inconsistent with the true facts about Quad Six. In Paragraph 14, she wrote that the "distinctive thermostat design and shape shown in the above-identified U.S. trademark application of Honeywell Inc. has been exclusive in the trade and no competitors have produced a thermostat with a similar shape or design, despite the fact that the design patent of Honeywell Inc. on the thermostat shape expired some 16 years ago." *Id.* at 010278, ¶ 14. As noted above, Honeywell's briefs repeatedly made this broad assertion, without ever addressing the fact of Quad Six's competing round thermostat, which Honeywell had removed from the market a few months earlier by buying the company (instead of suing it while the trademark application was pending). See Eco. Resp. Br., Ex. 27 at 007806.

Was this willful deceit? The truth about Quad Six could have been discerned from Honeywell's presentation, but it was buried—under many false generalizations. Honeywell did in fact disclose, in as obscure a way as possible, the fact that Quad Six had been selling round thermostats that competed with Honeywell before

Honeywell bought the company. This approach apparently led the TTAB to follow the generalizations and to miss the correct facts. On the limited record at this stage, however, because the facts about Quad Six were included in Honeywell's submission, the court cannot say that Eco is likely to succeed in showing fraudulent intent by clear and convincing evidence on the subject of Quad Six's competing design.[11]

*Hunter Fan:* The Hunter Fan round design did not come to Honeywell's attention until a few weeks after it filed the application for the '108 mark. As noted above, Honeywell sent a cease-and-desist letter to Hunter Fan on June 30, 1986 insisting that a round design would infringe Honeywell's trademark rights. Lawyers for Honeywell and Hunter Fan— including the lawyer who was prosecuting the trademark application—exchanged argumentative letters for the next year and a half while Honeywell's application was pending. Internal references in the documents submitted to this court indicate that Hunter Fan was in fact advertising and selling its round design by May 7, 1987. See Eco Resp. Br., Ex. 26 at 002690 (noting that customer had said "We've got Hunter now" with note "30–60 days"); Ex. 123 (Hunter Fan's offer to "discontinue production and sale" of round models). Also, a later draft settlement agreement would have given Hunter Fan several months to dispose of its remaining inventory of round thermostats.

In the meantime, Honeywell and its lawyers continued to argue to the TTAB that competitors had not copied the design, showing that it was not functional. Honeywell and its lawyers then qualified that assertion by limiting the claim to the time of the Ruminsky Declaration, April 30, 1986, before Honeywell learned of the Hunter Fan round design. There is no indication that the TTAB or the examining attorney asked exactly the right questions to extract from Honeywell the later information about Hunter Fan. While the court is not prepared to find fraudulent intent by clear and convincing evidence, the careful phrasing and hedging in Honeywell's submissions help show why the TTAB's decision in its *ex parte* proceeding is not entitled to any deference at this point.

Accordingly, Eco has not yet shown it is likely to be able to establish by clear and convincing evidence that Honeywell obtained the '108 trademark through fraud. Eco has shown, however, that the TTAB decision was based on an incomplete factual record, and a record that the TTAB misread in key respects.[12]

### E.  *Likelihood of Confusion*

The court's conclusion that Honeywell does not have valid trademark rights in

11.  Also, despite Honeywell's repeated assertions to the TTAB that competitors had been free to use round designs at least after 1970, Honeywell did not inform the TTAB that it had threatened to sue competitors who sought to use such a design. The evidence shows that Honeywell threatened to sue both Quad Six and Hunter Fan for violating what Honeywell claimed were common law trademark rights in the round thermostat. See Eco. Resp. Br., Exs. 27 (Quad Six), 26 (Hunter Fan). The evidence indicates that Honeywell viewed the acquisition of Quad Six as an alternative to litigation to protect the round design. Eco Resp. Br., Ex. 27 at 007776.

12.  Honeywell has argued that Eco cannot raise a defense of fraud because it was not pleaded with particularity. See Fed.R.Civ.P. 9(b). However, this case is before the court on a motion for preliminary injunction. If Eco wishes to amend its reply to Honeywell's counterclaims to add a defense of fraud, it will certainly be entitled to do so under the liberal amendment standard under Fed. R.Civ.P. 15. Also, Eco has stated its allegations of fraud with great particularity in its briefs in opposition to Honeywell's motion for preliminary injunction and has supported the allegations with evidence that would at least permit an inference of fraudulent intent.

the '108 registration of its circular, convex shape means that Honeywell does not have a reasonable likelihood of prevailing on the merits of its trademark claim. Because a higher court might disagree on that issue, however, the court addresses the second element of Honeywell's case on the merits: Whether Eco's sale of its proposed Eco Stat thermostat is likely to cause confusion among buyers regarding the origin of Eco's product or its affiliation (or lack of affiliation) with Honeywell.

■ The Seventh Circuit analyzes likelihood of confusion in terms of seven factors: the strength of the owner's mark, similarity between the marks, actual confusion, the accused infringer's intent, similarity of products for which the marks are used, area and manner of concurrent use, and the degree of care likely to be exercised by buyers. *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 897 (7th Cir.2001). No single factor is decisive, but the Seventh Circuit treats the similarity of marks, the accused infringer's intent, and evidence of actual confusion as the most important factors. *Id.* at 898.

■ As a result of Honeywell's long-standing exclusive rights to the circular shape for thermostats, the evidence shows that Honeywell can show a likelihood of confusion among consumers, at least initially, about the origin and/or affiliation of the Eco Stat product. In light of this finding, though, it bears repeating: *TrafFix Devices* establishes beyond dispute that if the design or configuration in question is functional, then trademark protection is not available regardless of secondary meaning or the likelihood of confusion. *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 33, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) ("Functionality having been established, whether MDI's dual-spring design has acquired secondary meaning need not be considered."). Also, in light of Honeywell's emphasis on its long history of selling The Round and investing in its reputation for quality, it is also important to note another teaching of *TrafFix Devices:* "The Lanham Act, furthermore, does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller." *Id.* at 34–35, 121 S.Ct. 1255. It is after all "no great trick to build up secondary meaning in a product configuration if [competitors] are kept from utilizing that configuration for 17 years by the sword and shield of patent protection." *Zip Dee, Inc. v. Dometic Corp.,* 931 F.Supp. 602, 615 (N.D.Ill.1996).

1. *Strength of Honeywell's '108 Mark*

■ Apart from the (fatal) issue of functionality, Honeywell's '108 mark is a strong mark, one that is "incontestable" as a matter of law. Also, Honeywell has been using the basic shape for about fifty years and has sold approximately 85 million round thermostats. Honeywell has featured the round design in its advertising over the past 50 years, spending an estimated $70 million. The evidence from all witnesses in the industry shows that Honeywell's round design is well known and associated with Honeywell as the source of round thermostats.

2. *Similarity of the Parties' Marks*

Focusing on the trade dress trademark, which is the '108 mark, and again putting aside the issue of functionality, Honeywell has shown that the "trade dress" of its '108 mark and Eco's product are substantially similar. See attached Exhibits C and D. Both products have a round base, a round cover, a circular plate for showing actual temperature and a circular dial for adjusting the desired temperature, and a

name-plate in the center. The control switches are in the same locations at approximately 10 o'clock and 2 o'clock on the dial.

Eco has argued that the two designs are distinct from one another, but the court considers the differences minor. Eco uses numbers that are slightly larger in size with phosphorescent coating and that end in 5 to show temperature (i.e., 55, 65, and so forth), while Honeywell uses smaller, non-phosphorescent numbers ending in zero. See Ex. 303. Eco uses dots to show intermediate temperatures, while Honeywell uses short dash marks. The circular cover of Eco's product is conical in profile, as opposed to convex, but the difference is sufficiently subtle so as not to avoid a likelihood of at least initial confusion in an industry where "round means Honeywell." Eco uses the name "Eco Stat" on the name-plate, of course, and its name-plate has two small "ears" at the 9 o'clock and 3 o'clock positions, but that difference has a minimal effect on the overall appearance of the trade dress. Eco also has a button on the top of the thermostat to light the display for easy night viewing.

### 3. *Evidence of Actual Confusion*

Because the Eco product is not yet for sale there is no evidence of actual confusion in the marketplace. However, Honeywell commissioned a survey of HVAC contractors to test likelihood of confusion. Walter McCullough conducted the survey. He brought substantial experience and expertise to the task, and he used reliable methodology and procedures to determine the likelihood of confusion. In brief, a representative sample of HVAC contractors were mailed a photograph of the Eco Stat thermostat. During telephone interviews, the HVAC contractors were to look at the photo as long as they wished, and then put it out of sight. They were then asked to identify who made the thermostat and the reasons for their answer. Similar questions were then asked about whether the maker was affiliated with or licensed by any other company. The interviewers did not mention the name Honeywell to any of the respondents.

The results showed that 58 percent of HVAC contractors, after looking at the picture of the Eco Stat, believed that it was made by, associated with, or licensed by Honeywell. When asked to explain their reasons, the overwhelming reason given was the overall circular appearance of the Eco Stat product. This survey provides substantial support for a finding of likely confusion. Compare, *e.g.*, *Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 935 (7th Cir.1984) (45 percent confusion results were "high" and weighed "strongly" in support of likelihood of confusion), with *Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir. 1983) (7.6 percent confusion weighed against infringement).

Eco's criticisms of the survey have little weight. First, it was reasonable to survey only HVAC contractors, who are the key decision-makers for about 70 percent of residential thermostat purchases. Second, the choice of the head-on view of the Eco product in the photograph (as opposed to an oblique view that would show the conical profile) was also reasonable. Many thermostats are depicted head-on in catalogs and other trade publications. Third, McCullough reasonably tabulated the data and treated as confusion any answers associating the Eco Stat with Honeywell based on its shape or appearance, such as: "If it's round, it's Honeywell." Fourth the chosen control stimulus—a rectangular thermostat with a small round control dial and the same Eco Stat name—was a reasonable choice.

### 4. *The Accused Infringer's Intent*

Much of the evidence at the hearing was devoted to this issue of intent. The evi-

dence shows that Eco started out with the intent to copy the appearance of Honeywell's design based on the belief that it was no longer protected by utility patents. See Ex. 6. Eco consulted a patent and trademark lawyer who also made a blind inquiry to Honeywell about making a "substantial duplicate" of the T87 design. Ex. 18. Honeywell agreed that it had no patent protection for the product but informed the lawyer of the '108 registration. That warning led the lawyer to advise Eco that he "could not recommend going forward with manufacturing the round casing regardless of the interior indicating configuration." Ex. 173.

Eco continued with the project and a couple of months later consulted another lawyer, Paul Maginot, who viewed the problem differently. Maginot initially told Eco that the plan to copy the T87 as closely as possible would infringe Honeywell's trademark rights. Tr. 69 (Peabody). But Maginot advised Eco to make a number of minor changes. Those changes convinced Maginot that the Eco Stat design would not infringe Honeywell's rights. Tr. 69–71 (Peabody). Maginot followed that oral advice with a detailed opinion letter in December 2002, stating that the Eco Stat design, which incorporated several minor differences discussed above, would not infringe Honeywell's trademark, trade dress, or design patent rights. Ex. 172 at 1. The letter concluded by noting that litigation would be costly and that the outcome could not be guaranteed, but that there was "a reasonable likelihood" that Eco would prevail if the issues were litigated. Ex. 172 at 20. With that opinion letter in hand, Eco displayed the Eco Stat at the trade show in January 2003, which triggered Honeywell's cease-and-desist letter.

Good intent does not save an otherwise infringing product. "Bad" intent can aggravate the case of an infringing product. The court does not find that Eco's intent is an aggravating factor here. Eco started out with a plan to reverse-engineer and essentially copy the Honeywell product. Such copying can be perfectly lawful and ethical. See *TrafFix Devices*, 532 U.S. at 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (allowing competitors to copy products will have salutary effects in many instances); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) ("Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology.").

In the course of developing its product, Eco consulted qualified counsel. When Honeywell warned of its asserted trademark rights, Eco consulted another law firm that had more resources and broader expertise than the first lawyer Eco consulted. Tr. 95–96 (Peabody). The mere fact that Eco sought a second opinion does not show that it was acting with bad intent.[13] Also, Eco developed its own name and trademark to use on the product, and Honeywell has not tried to argue that Eco's packaging or marketing and advertising threaten to add any risk of confusion beyond any that might result from Eco's use of the circular design.

Finally, although the court disagrees with Mr. Maginot's opinion about the effect of the various changes in the Eco Stat design, Honeywell has not shown that Eco

---

13. Eco's first lawyer did not say that he agreed with Honeywell's assertion of broad rights to the circular shape, only that he could not recommend taking a course of action contrary to Honeywell's assertion of its rights. In the face of a potential adversary with Honeywell's resources and desire to protect the round design, that first lawyer's advice may have reflected only sensible business advice that took into account the expense and risks of litigation.

could not reasonably rely on that opinion or that it did not rely in good faith on that opinion. Trademark cases involving trade dress, and especially those involving product configuration, are notoriously difficult, and reasonable judges and lawyers can disagree about the proper decision.

### 5. Products and Channels of Trade

In this case, the parties' products are both low-cost, non-programmable residential thermostats. They will compete directly with one another, and they will be sold through identical channels of trade. This factor tends to support Honeywell's case for likelihood of confusion.

### 6 & 7. Degree of Care and Customer Sophistication

The most important customers here are HVAC contractors, who make the key buying decisions for about 70 percent of residential thermostat sales. These HVAC contractors are familiar with the thermostat market and are reasonably sophisticated in their buying decisions. Despite those facts, which would tend to weaken the case for likelihood of confusion, the McCullough survey shows that a high proportion of such buyers is likely to be confused, at least initially, by the round shape of the Eco Stat. These factors tend to support Honeywell's case.

In sum, then, apart from Eco's functionality defense, Honeywell has shown a reasonable likelihood of prevailing on the merits of its trademark infringement case based on the '108 trademark covering the shape of Honeywell's round thermostat design.

### VI. Likelihood of Success on the Merits: "The Round" Trademark

■ Honeywell also argues that the Eco Stat product will infringe Honeywell's trademark on the words "The Round." This argument adds nothing to Honeywell's case. On this trademark, Honeywell has not shown any likelihood of prevailing on the merits. If Honeywell is not entitled to protect the round shape because it is functional, and if competitors are permitted to compete by selling other round thermostats, then Honeywell's trademark on the words "The Round" cannot give it exclusive rights to the round shape. Eco has not used a name or word, or packaging or advertising that would create confusion with Honeywell's "The Round" trademark, nor is there any evidence that Eco intends to do so. Honeywell's reliance on Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 257 (2d Cir.1987), and Beer Nuts, Inc. v. King Nut Co., 477 F.2d 326, 329 (6th Cir.1973), would not justify trademark protection of a functional shape just because Honeywell managed to obtain a trademark on a word that describes that shape. The flying horse in Mobil Oil was obviously an arbitrary mark. The Beer Nuts case was decided based on a contractual estoppel theory and has no application here.

### VII. Likelihood of Success on the Merits: Trademark Dilution Claim

■ Honeywell also claims that Eco's product will dilute Honeywell's trademark in violation of the federal Anti–Dilution Act, 15 U.S.C. § 1125(c). The court assumes for the present that Honeywell's trademarked shape is a "famous" mark for purposes of Section 1125(c). The Anti–Dilution Act can be especially important when a defendant begins using a name or other mark that is similar to plaintiff's, but uses it to identify different types of products or services. Two often-cited examples were the hypothetical "Buick aspirin" and "Kodak piano." See generally Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 431, 123 S.Ct. 1115, 1123, 155 L.Ed.2d 1 (2003). Where the parties are in direct competition with one another, however, so

that likelihood of confusion can be shown under conventional trademark law, the Anti–Dilution claim adds nothing to an otherwise meritorious case of trademark infringement. See *id.* at 431, 123 S.Ct. at 1123 ("The committee's report stated that the 'purpose of H.R. 1295 is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of a likelihood of confusion.'"), quoting H.R.Rep. No. 104–374, p. 2 (1995), U.S.Code Cong. & Admin.News 1995, pp. 1029, 1030.

▮ Also, Honeywell agrees that the Anti–Dilution Act cannot be used to protect functional features of a product's design. Tr. 543. Accordingly, Honeywell has not shown that it is likely to prevail on its claim for dilution under the Anti–Dilution Act.

## VIII. *Irreparable Harm*

▮ Apart from the functionality defense, Honeywell would be entitled to a presumption that use of an infringing trademark is likely to cause irreparable harm. See *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir. 1992); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1091 (7th Cir.1988). It is notoriously difficult to quantify the losses to goodwill and reputation and any loss of sales that might result from trademark infringement.

## IX. *Balance of Harms*

In evaluating the balance of harms, the court must consider the consequences of an erroneous decision, in either direction: the harm to Honeywell if an injunction is erroneously denied, and the harm to Eco if an injunction is erroneously granted. See generally *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir.2001) (balancing "the irreparable harm that the nonmoving party will suffer if preliminary relief is granted ... against the irreparable harm the moving party will suffer if relief is denied").

The balance of harms in this case is essentially evenly balanced, so that it does not affect the court's decision to deny relief. If the court is erring by denying a preliminary injunction, the result is likely to be some confusion by some buyers who encounter Eco's product and some erosion of Honeywell's good will associated with the round thermostat design. Such harm is difficult to compensate with a later damage award. If the court were to grant an injunction erroneously, the result would be substantial competitive harm to Eco and to buyers who would benefit from a competing source of a round thermostat. Eco is just launching its business, so it does not have a track record. A delay in the opportunity to compete would be very difficult to compensate with a damage award.

## X. *Public Interest*

The public has an interest in both the enforcement of legitimate trademark rights and the confinement of those rights to their proper channels, so as to permit competitors to copy unprotected features of useful and desirable products. In the court's view, the evaluation of the public interest factor in this case is only an echo of the court's view of the merits of the case. The factor does not add weight to either side's case.

## XI. *Conclusion*

The shape of Honeywell's round thermostats cannot be protected by a valid trademark. That round shape was the subject of a long-expired utility patent. Eco and other competitors are entitled to copy that useful and functional shape so long as they do not take other steps to create the impression that their round thermostats are made by or associated with Honeywell.

Accordingly, Honeywell is unlikely to prevail on the merits of its trademark claims, and its motion for a preliminary injunction is hereby denied.

So ordered.