**ASICS CORPORATION and ASICS Tiger Corporation, Plaintiffs,**

v.

**TARGET CORPORATION, Defendant.**

**No. Civ. 03–3486(RHK/AJB).**

United States District Court, D. Minnesota.

Aug. 4, 2003.

Michael R. Friscia and David J. Sprong, Wolff & Samson P.C., West Orange, New Jersey; R.J. Zayed and Joel D. Leviton,

Fish and Richardson P.C., P.A., Minneapolis, Minnesota; Heidi E. Harvey, Fish & Richardson P.C., Boston, Massachusetts, for Plaintiffs.

Tim F. Williams, Wellington M. Manning, Jr., and Timothy D. St. Clair, Dority & Manning, P.A., Greenville, South Carolina; James R. Steffen and Lianne C. Knych, Faegre & Benson, Minneapolis, Minnesota, for Defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter comes before the Court on Plaintiffs' Motion for a Preliminary Injunction. Plaintiffs' ASICS Corporation and ASICS Tiger Corporation (collectively, "ASICS") have sued Defendant Target Corporation ("Target") alleging that Target's PROSPIRIT brand "Wyat" running shoes infringe ASICS' "stripe design" trademark. ASICS has moved for a preliminary injunction asserting that "the continued sale of the infringing shoes will cause further confusion in the marketplace and cause further irreparable harm to ASICS' reputation, business, and goodwill." (Pls.' Mem. Supp. Prelim. Inj. at 2.) For the reasons set down below, the Court will deny the Motion.

### Background

#### I. ASICS Shoes and the Stripe Design

ASICS is in the business of designing, manufacturing, and marketing athletic and fashion footwear, related apparel, and accessory products. (Bourne Decl. ¶ 5.) It identifies its shoes with a stripe design running along the side ("the Stripe Design"). The Stripe Design consists of

> two lateral strip members ... substantially parallel to one another and two longitudinal strip members ... substantially parallel to one another, the pairs of lateral and longitudinal strip members crossing each other to form crosspoints in a center of the side portion of the shoe between its opposite ends and generally centrally between [the eyelets and sole].

(Williams Decl. Ex 1 (U.S. Patent No. 5,553,279) at col. 3, 11. 25–48.) In 1972, ASICS obtained U.S. Trademark Registration No. 937,464 for the Stripe Design on many types of shoes.[1] (Bourne Decl. ¶ 11.) The Stripe Design was first used in commerce in 1966. (*Id.*) Since that time, ASICS and its predecessors have used it on virtually all their footwear products. (*Id.* ¶ 7.)

Since 1990, ASICS has sold approximately 65 million pairs of athletic shoes in the United States bearing the Stripe Design. (*Id.* ¶ 14.) ASICS' total net footwear revenue during that time has been in excess of $2 billion. (*Id.* ¶ 14.) ASICS

---

1. Since that time, ASICS has obtained a multitude of trademark registrations for the Stripe Design on athletic shoes and other products. These include, Registration No. 1,273,516 (for duffle bags and other products), Registration No. 1,283,615 (on the Stripe Design in a circle, for sports shoes and sportswear), Registration No. 1,283,437 (on the Stripe Design with the word "TIGER" for shoes), Registration No. 1,291,040 (on the Stripe Design with the word "TIGER," for duffle bags and other products), Registration No. 1,294,473 (for the Stripe Design with the words ASICS TIGER, for shoes and sportswear), Registration No. 1,300,721 (for knee pads for athletic use), Registration No. 1,303,804 (for shoes and apparel), Registration No. 1,310,059 (for the Stripe Design in a circle, for duffle bags and other products), Registration No. 1,310,121 (for the Stripe Design in a circle, for towels), Registration No. 1,780,093 (for sunglasses), and Registration No. 1,781,511 (for socks, hats, innersoles, sock liners, and sandals). (*See* Bourne Decl. ¶ 12.)

shoes are generally considered to be of high quality (*id.* ¶ 6) and its running shoes range in price from $65 to $110. (*Id.* at Ex. 34.)

## II. Target and Prospirit

In April 2003, Target stores nationwide began selling a shoe called the "Wyat" as one of several low-cost athletic shoes offered for sale at Target stores under Target's PROSPIRIT brand. (Koller Decl. ¶¶ 4, 9.) The "Wyat" shoe has breathable side panels crossed by one wide horizontal support (displaying two colored stripes) and two slanting vertical supports (each also displaying colored stripes). (*Id.* ¶ 6.) The full retail price of the "Wyat" is $24.99. (*Id.* ¶ 3.) Target does not sell any ASICS footwear or any footwear under other brands marketed as high-performance footwear, such as Nike, New Balance, or Reebok. (*Id.*)

## Standard of Decision

 Whether preliminary injunctive relief should be granted depends on an evaluation of the following factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunctive relief will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *See Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). "When applying the *Dataphase* factors, as they have come to be called, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir.1999) (internal quotation marks and citations omitted). The party requesting preliminary injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v.*

*Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

 The likelihood of success on the merits is not, alone, determinative. *See Dataphase*, 640 F.2d at 113. Rather, a court must consider the particular circumstances of each case, remembering that, "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* If the threat of irreparable harm to the movant is slight when compared to the likely injury to the other party, the movant carries a particularly heavy burden of showing a likelihood of success on the merits. *See Dataphase*, 640 F.2d at 113.

## Analysis

### I. Likelihood of Success on the Merits

ASICS has the burden of demonstrating that it has a likelihood of success on the merits. It argues that the marked similarity between the Stripe Design and a similar stripe pattern on the side of Target's "Wyat" shoe makes it likely that the public will be confused as to the sponsorship, affiliation, and source of Target's shoe. Conversely, Target asserts that ASICS' trademarks do not cover the stripes on the side of Target's shoe. Moreover, it contends that the Stripe Design cannot be used as a trademark because it is functional, and therefore invalid and unenforceable. The Court will address the functionality argument first.

### A. Functionality

 The functionality doctrine prevents a producer from using trademark law to inhibit competition by controlling a useful product feature in perpetuity. "It is the province of patent law, not trademark law, to encourage invention by grant-

ing inventors a monopoly over new product designs or functions for *a limited time,* after which competitors are free to use the invention." *Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (emphasis added) (internal citation omitted). Generally, " 'a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' " *TrafFix Devices v. Marketing Displays,* 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (quoting *Qualitex,* 514 U.S. at 165, 115 S.Ct. 1300, quoting, in turn, *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)); *see also Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 868 (8th Cir.1994). While a functional feature is sometimes described as one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage," *Qualitex,* 514 U.S. at 165, 115 S.Ct. 1300, "there is no need to ... consider if there is a competitive necessity for the feature" where the design is essential to the article's use or affects its cost or quality, *TrafFix,* 532 U.S. at 32, 121 S.Ct. 1255.

Target asserts that the Stripe Design is functional because ASICS (1) has claimed the Stripe Design as an element in two recent utility patents, and (2) asserted the functionality of the Stripe Design in its marketing materials. ASICS counters that the Stripe Design is *not* an element claimed in its utility patents, and that if the primary purpose of the Stripe Design was once functional, it no longer is. The Court will address those arguments in turn.

**2.** In this context, "skeleton" means "something forming a structural framework," *Webster's Third New International Dictionary* 2131 (1986), and "skeleton-shaped" means some-

### 1. Utility Patent

▬▬▬ "A utility patent is strong evidence that the features therein claimed are functional." *TrafFix,* 532 U.S. at 29, 121 S.Ct. 1255; *see also* J. Thomas McCarthy, 1 *McCarthy on Trademarks and Unfair Competition* 7:89 (2003) [hereinafter *"McCarthy on Trademarks"*] (noting that the Court, for emphasis, repeated the phrase "strong evidence" four times and at a fifth point used the similar phrase "strong evidentiary inference of functionality"). The Court must examine a utility patent "closely to ensure that the disclosure of the configuration is primarily functional and not merely incidental." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1007 (9th Cir.1998). A utility patent is of "vital significance" to the functionality inquiry. *TrafFix,* 532 U.S. at 29, 121 S.Ct. 1255.

Here, Target has presented two ASICS utility patents that it asserts include the Stripe Design among the elements claimed: U.S. Patent 5,533,279 ("the '279 patent"), and U.S. Patent 5,430,959 ("the '959 patent"). ASICS flatly denies that the Stripe Design is among the elements claimed.

### a. The '279 patent

▬▬▬ The '279 patent, for which ASICS is the assignee, claims a shoe having a "skeleton-shaped outer carapace." [2] U.S. Patent No. 5,533,279, col. 6, 1. 43. Claim 1 of the patent claims the shoe, where the "skeleton-shaped outer carapace" comprises:

 a sole;

 a hard and skeleton-shaped outer carapace portion fixed onto said sole for holding and protecting a foot, said out-

thing in the shape of a structural framework around the shoe. "Carapace" means "any hard or protective outer covering." *Id.* at 335.

er carapace portion unitedly having a toe reinforcement portion, a heel reinforcement portion, an eyelet portion, a **longitudinal reinforcement portion connecting said sole with said eyelet portion, and a lateral reinforcement portion connecting said sole with said heel reinforcement portion in such manner that a cross-point thereof lies at a substantial center along a side portion of said shoe between opposite ends thereof thereby to form a skeleton** in association with said toe reinforcement portion, said heel reinforcement portion and said skeleton defining at least four holes around said crosspoint; and

a soft inner carapace portion for directly contacting a foot, said inner carapace portion being contained in said outer carapace portion and fixed on said sole in at least one portion of a lower edge thereof, and said inner carapace portion being separated from said outer carapace portion at all portions of said inner carapace above said sole in such a manner that said inner carapace portion moves independently of said outer carapace portion.

*Id.* at col. 6, ll. 15–42 (emphasis added). Claim 2 recites the same language, replacing the period at the end of claim 1 with a comma, and adding:

said outer carapace portion having **two of longitudinal reinforcement portions substantially parallel to each other and two of said lateral reinforcement portions substantially parallel to each other, which cross each other so as to form four cross-points in a center of said side portion of shoe.**

*Id.* at col. 7, ll. 4–9 (emphasis added). Claims 1 and 2 are each independent claims.

Target argues that these "longitudinal reinforcement portions" crossing the "lateral reinforcement portions" constitute the Stripe Design. ASICS counters, through the Declaration of its General Counsel, Michael E. Zall, that this "does not describe ASICS' Stripe Design, which includes two long, gently curving, diverging stripes extending from a rear portion to a forward portion of a shoe." (Declaration of Michael E. Zall ¶ 9.) Target is correct.

Diagrams of the preferred embodiment, which is part of the specification, clearly show the Stripe Design as the "longitudinal" and "lateral reinforcement portions." *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) ("Claims must be read in view of the specification, of which they are a part."). As shown in the specification, the Stripe Design contains "substantially parallel" longitudinal stripes "connecting said sole with said eyelet portion" and "substantially parallel" lateral stripes "connecting said sole with said heel reinforcement portion" that "cross each other so as to form four crosspoints in a center of said side portion of shoe." U.S. Patent No. 5,533,279 col. 7, ll. 5–6; col. 6, l. 23; col. 7, l. 7; col, 6, ll. 24–25; col. 7, ll. 8–9. This provides "very significant" and "strong evidence" of the Stripe Design's functionality.

While ASICS asserts that the claims of the '279 patent do not include the Stripe Design,[3] "[a] claim construction that excludes from its scope a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support." *Bowers v. Baystate Techs.,*

---

**3.** At oral argument, counsel for ASICS appeared to back off this statement and suggest, instead, that because other designs read on the claims of the '279 patent, the Stripe Design is still a valid trademark. ASICS, however, provides no support for this apparently novel theory, which certainly runs contrary to a patent infringement analysis.

*Inc.*, 302 F.3d 1334, 1345 (Fed.Cir.2002). The only plausible ground for such an assertion is that the lateral stripes of the Stripe Design diverge (or converge) while the lines of the "lateral reinforcement provision" are "substantially parallel." Of course, in usual, Euclidian geometry, perfectly parallel lines do not meet. *Substantially* parallel lines, however, can and do meet, *see Webster's Third New International Dictionary* 2280 (1986) (defining "substantial" as "to a large degree or in the main"), and even perfectly parallel lines can meet in non-Euclidian geometry where the usual points of the plane are attached to an infinite point. In the present case, where the patent specification clearly shows these substantially parallel lines meeting, *see Electro Scientific Indus., Inc. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1347 (Fed.Cir.2002) (an inventor may act as his own lexicographer and use the specification to supply new meanings for terms, either explicitly or implicitly), and where ASICS has failed to provide "highly persuasive evidentiary support," *Bowers*, 302 F.3d at 1345, there can be little argument but that the Stripe Design is a covered–and, in fact, preferred–element of the '279 patent.

ASICS implies that, even if the Stripe Design is claimed in the '279 patent, it is merely an arbitrary or incidental aspect of those claims. ASICS quotes–without providing analysis–Justice Kennedy's controversial dictum from *TrafFix:*

> In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result [than a finding of functionality] might obtain. There the manufacturer could perhaps prove those aspects do not serve a purpose within the terms of the utility patent.

532 U.S. at 34, 121 S.Ct. 1255. This statement has raised substantial questions. As J. Thomas McCarthy, author of the definitive treatise on trademark law, has commented:

> The problem with this observation is that non-functional elements should not appear and do not appear in patent *claims*. The "specification" of a patent discloses and describes; the "claims" define the scope of the invention. Things such as "arbitrary curves" and a painted "ornamental pattern" have no business appearing in a patent claim. Such non-functional elements cannot properly delimit the scope of a utility patent. However, such things are commonly disclosed in the specification of a patent. In the author's view, the Supreme Court confused a patent claim with a patent disclosure.

*McCarthy on Trademarks* § 7:89. Nonetheless, assuming that a claim in a utility patent *could* include arbitrary, incidental, or ornamental features, the next stage of the Court's analysis is to "go beyond the claims of . . . [the] utility patent and examin[e] the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention." *TrafFix*, 532 U.S. at 35, 121 S.Ct. 1255.

Here, the Stripe Design is specifically touted for its usefulness in both the specification and the prosecution history. The diagram of the preferred embodiment in the specification specifically identifies the Stripe Design as the "skeleton-shaped reinforcement portion." According to the description of the preferred embodiment:

> The skeleton-shaped reinforcement portion 6 has a skeleton construction made only by a lateral strip member and a longitudinal strip member 11 which are dimensioned well enough to connect the sole 2, the toe reinforcement portion 3, the heel reinforcement portion 4, and

the eyelet portion 5 with each other and **reinforce the shoe**. Therefore, **a plurality of openings are formed in the reinforcement portion to thereby** *improve air permeability and lighten the shoe.* U.S. Patent No. 5,533,279, col. 5, ll. 8–16 (emphasis added). Likewise, the prosecution history notes the "skeleton" formed where the "longitudinal reinforcement portion crosses the lateral reinforcement portion," and states that "the outer carapace is shaped in the skeleton formed by **minimum portions which are essential for fixedly holding and protecting the foot, and this provides for an overall** *lightening of the shoes.*" (Williams Decl. Ex. 2 ('279 patent file wrapper) (emphasis added).) These statements both confirm the strong evidence of the Stripe Design's functionality drawn from the claims and provide significant and persuasive independent evidentiary support of its functionality.

### b. The '959 Patent

■ Target also advances the '959 patent, although with much less analysis, as further evidence of the Stripe Design's functionality. The '959 patent claims "a tightening member in **combination with a shoe**." U.S. Patent No. 5,430,959, col. 5, l. 46. While the claims are silent as to the type of shoe the tightening member is to be combined with, the specification includes diagrams of the preferred embodiment, which incorporate the Stripe Design. Referring to these diagrams, the specification states: "As shown in FIG. 1, **a shoe 1** *of the present invention* **includes** ... **a skeleton-shaped reinforcement portion 6** ...." This "skeleton-shaped reinforcement portion" is described in language almost identical to that quoted above for the '279 patent. The functionality of the Stripe Design is stressed, noting that "a plurality of openings are formed in the reinforcement portion to improve air

permeability and lighten the shoe." *Id.* at col. 4, ll. 43–45. While the evidence pertaining to this patent is less convincing than that pertaining to the '279 patent–in part, because the Stripe Design is not expressly included in the claims (although it is perhaps implicitly included)–it nonetheless provides further evidence of functionality. Moreover, in the case of the '959 patent, it is evidence that is entirely unrebutted.

### 2. Marketing Materials

■ Target also asserts that various ASCIS' marketing materials provide evidence of the Stripe Design's functionality. Advertising or other marketing by the proponent of trademark rights that touts the utilitarian features of its design can provide significant evidence of functionality. *See Epic Metals Corp. v. Souliere,* 99 F.3d 1034 (11th Cir.1996) (evidence of plaintiff extolling the functional advantages of an industrial design helps prove functionality); *In re Bose Corp.,* 772 F.2d 866 (Fed. Cir.1985) (holding pentagonal shape of loudspeaker functional where applicant's promotional materials lauded shape as functional part of sound system); *McCarthy on Trademarks* § 7:74 ("If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality.").

■ Here, Target identifies two pieces of marketing indicating that the Stripe Design was originally conceived as a functional part of the shoe. First, Target advances a 1986 ASICS Footwear Catalog, which includes a section called "Featured Functions." (Bourne Decl. Ex. 19 (1986 catalog) at 33.) That section states, under a picture of the Stripe Design:

**Logo Support Stripes–**
Originally designed as a special reinforcement (before logos on shoes became popular). The Tiger stripes pro-

vide additional support and prevent the upper form from stretching.

(*Id.*) Likewise, the ASICS website describes a functional origin for the Stripe Design:

> The "OLYMPIC LINE" [ASICS' shoe] had two parallel lines on the outer side of each shoe running from the instep to the arch; and intersecting those was a long "Y" shaped line starting from the back of the shoe, going over the little toe to the sole. This design is still used on ASICS shoes today. **These lines were not just for decoration. They were there to keep the leather around the toes from going slack and losing its shape; and to protect the Achille's [sic] tendon area.**

(*See* ASCIS, "The Shoe Epochs: The Starting Point for Running Shoes," *available at*, http://asics.cy-plus.com/index_e.html (emphasis added).) Target asserts that these marketing materials show that the Stripe Design was conceived of functionally.

ASCIS argues that "[e]ven if the stripe design was functional when it was first developed almost forty years ago,[4] the advanced materials used in manufacture of athletic shoes long ago obviated the need therefore." (Pls.' Reply Mem. Supp. Prelim. Inj. at 7–8.) To support the position that a feature once deemed functional can later become non-functional, ASICS cites *In re Honeywell*, 8 U.S.P.Q.2d 1600 (Trademark Tr. & App. Bd.1988), and *In re Zippo Mfg. Co.*, 50 U.S.P.Q.2d 1852 (Trademark Tr. & App. Bd.1999). Both cases, however, are readily distinguishable. While it is true, for instance, that the Trademark Trial and Appeals Board

("TTAB") permitted Honeywell to overcome an earlier rejection and trademark the circular shape of its thermostats, *Honeywell* was decided in an *ex parte* proceeding using a legal standard since invalidated by the Supreme Court. *See ECO Mfg. LLC v. Honeywell Int'l, Inc.*, 2003 WL 21524860 (S.D.Ind.2003) (denying Honeywell's motion for a preliminary injunction for trademark infringement in part because of the functionality of its circular thermostat design).[5] Similarly, although the TTAB did allow Zippo to trademark the design of its lighters over a previous rejection, *Zippo* was decided in an *ex parte* proceeding, under a different legal standard, without a relevant patent before the TTAB, and without evidence of marketing promoting the functional advantages of the design. *See* 50 U.S.P.Q.2d at 1853–55, 1999 WL 398181. Here, in the presence of both marketing touting the utilitarian origin of the design and a recent patent confirming its continued utility, the Court concludes that Target has advanced compelling evidence that the Stripe Design was designed to be–and continues to be–functional.

### B. Conclusion

██ The evidence before the Court strongly suggests that a jury would consider the Stripe Design to be functional. While no doubt "stripes, waves, and swooshes" are common in the industry (Pls.' Reply Mem. Supp. Prelim. Inj. at 6), the evidence indicates that ASICS has used the functionality of its logo to distinguish itself from its competition. Its advertising, in particular, suggests that while other logos are mere decoration, ASICS'

---

**4.** It is noteworthy that the 1986 catalog speaks of the functionality of the Stripe Design in the present tense: "The Tiger stripes *provide* additional support and *prevent* the upper form from stretching." (Bourne Decl. Ex. 19 at 33 (emphasis added).)

**5.** *ECO Manufacturing* –which was not mentioned by ASICS in its moving papers–was decided *before* ASCIS submitted its Reply citing *In re Honeywell*.

Stripe Design actually *does something.* Although it is true that "ASICS exclusive use of its Stripe Design mark for over 35 years has not stopped competitors from effectively competing" (*id.* at 8), the threshold question before the Court is whether the Stripe Design "is essential to the use or purpose of the article or if it *affects the cost or quality*" of shoes, *Inwood,* 456 U.S. at 850, n. 10, 102 S.Ct. 2182 (emphasis added). Because ASICS' own utility patents and marketing provide strong and convincing evidence that the Stripe Design affects the quality of shoes and is not "a mere arbitrary embellishment ... primarily adopted for purposes of identification and individuality," *Aromatique,* 28 F.3d at 873, and because this evidence has not been effectively rebutted, "there is no need to proceed further to consider if there is a competitive necessity for this feature." *TrafFix,* 532 U.S. at 33, 121 S.Ct. 1255.

Accordingly, the Court concludes, for the purposes of this Motion, that a jury would find that the Stripe Design is functional. ASICS therefore cannot demonstrate a likelihood of success on the merits, and the Court need not reach the question of whether ASICS has proven Target's shoes create a likelihood of confusion.

## II. Irreparable Harm

■ ASICS must also establish that irreparable harm will result without injunctive relief and that such harm will not be compensable by money damages. *Northland Ins. Cos. v. Blaylock,* 115 F.Supp.2d 1108 (D.Minn.2000) (Doty, J.); *see also In re Travel Agency Com'n Antitrust Litig.,* 898 F.Supp. 685, 689 (D.Minn. 1995) (Rosenbaum, J.) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury."). When injunctive relief is sought under the Lanham Act, the finding of likelihood of success on the merits

creates a presumption of irreparable harm. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.,* 815 F.2d 500, 505 (8th Cir.1987).

■ Here, ASICS has relied entirely upon that presumption to establish irreparable harm. Irreparable harm, however, "cannot be presumed where, as here, plaintiff has not established any prospect of success on the merits." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1184 (8th Cir.1998). Because ASICS has failed to make such a showing, and because it has failed to offer evidence that independently demonstrates imminent irreparable injury, the Court concludes that ASICS has not proven that it will be irreparably injured absent a preliminary injunction.

## III. Balance of Hardships

■ The next *Dataphase* requirement is that the harm to the plaintiff in the absence of a preliminary injunction outweighs the potential harm that granting a preliminary injunction may cause the defendant. *See Dataphase,* 640 F.2d at 114. The essential inquiry in weighing the equities "is whether the balance of other factors tips *decidedly* toward the movant." *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 624 (8th Cir.1987) (emphasis added).

■ Target has provided the Declaration of Tracey Koller, its Senior Buyer for men's athletic shoes. Her declaration states that the "Wyat" shoe is intended to be in stock at each of Target's 1,107 stores in 47 states. (Koller Decl. ¶ 16.) Therefore, according to Koller, an injunction would require Target to

immediately divert resources in each of [its] 1,107 stores to, among other things, manually locate the "Wyat" shoes that might be in that store, manually change the ... in-store sign[s] related to the

"Wyat" shoe, and manually make arrangements for whatever disposition might be made of the "Wyat" shoes that would be gathered from the 1,107 stores. Similarly, steps would need to be taken in any Target distribution center that might be holding inventory of the "Wyat" shoe.

(*Id.*) While ASICS states in its moving papers that "vast harm" would be inflicted upon ASICS in the absence of an injunction (Pls.' Mem. Supp. Prelim. Inj. at 15), it does not cite specific evidence to that effect. Where the movant has failed to "demonstrate a probability of ultimate success, the possibility that it will suffer any harm from [the challenged activity] is highly speculative and therefore does not serve to tip the balance of equities". *United Indus.*, 140 F.3d at 1184. Accordingly, the Court finds that this factor weighs in favor of Target.

### IV. *The Public Interest*

 The final factor the Court must consider is the public interest. *Dataphase*, 640 F.2d at 114. "By the very nature of a trademark action, the value placed on free competition must be weighed against any individual's property interest in that trademark, so that the analytic focus should also be on the consumer's ability to obtain the lowest priced goods." *Calvin Klein,* 815 F.2d at 505. The strong public interest in the lowest possible prices, avoiding monopolies, and encouraging, not stifling, competition, *see id.,* suggest that an injunction is not in the public interest "absent a more substantial showing that [plaintiff] has a viable claim". *United Indus.,* 140 F.3d at 1184. Where, as here, the movant has failed to make that showing, the public interest requires preserving the status quo until the issues can be fully adjudicated. *See Northland Ins.,* 115 F.Supp.2d at 1125.

Having failed to prevail on any of the *Dataphase* factors, the Court concludes that ASICS' Motion must be denied.

### Conclusion

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS ORDERED** that Plaintiff's Motion for a Preliminary Injunction (Doc. No. 2) is **DENIED.**[6]

---

6. In accordance with Fed.R.Civ.P. 52(a), the foregoing Memorandum Opinion and Order are the Court's findings of fact and conclu-sions of law which constitute the grounds of its action.